# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ORANGE**

| | |
|---|---|
| MAYBROOK FIRE DISTRICT, NY, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>-against-<br><br>3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); DUPONT DE NEMOURS, INC.; EIDP, INC. (F/K/A E.I. DUPONT DE NEMOURS AND COMPANY); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.; LION GROUP, INC.; MSA SAFETY INC; INNOTEX, CORP; AND MORRIS-CROKER LLC D/B/A FIRE-END & CROKER CORPORATION.<br><br>Defendants. | INDEX NO.:<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL:**<br><br>Trial by jury is desired in the County of Orange<br><br>Venue is designated pursuant to CPLR § 503(a) & (c) in that the causes of action occurred in this county. |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Table of Contents


I. INTRODUCTION .......... 1

II. PARTIES .......... 8

A. Plaintiff. .......... 8

B. Defendants. .......... 10

III. JURISDICTION AND VENUE .......... 17

IV. ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION .......... 21

A. General Allegations Regarding Per- and Polyfluoroalkyl Substances (“PFAS”) .......... 21

2. Defendant DuPont’s Long-Standing Knowledge of PFAS Dangers .......... 44

3. The Remaining Defendants’ Knowledge of the Dangers of PFAS .......... 49

4. Defendants’ Failure to Provide Safety Warnings on Product Labels .......... 60

5. Defendants’ Ability to Design Safer Turnout Gear .......... 64

V. CLASS ALLEGATIONS .......... 68

TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS DISCOVERY RULE TOLLING .......... 70

VI. FRAUDULENT CONCEALMENT TOLLING .......... 71

VII. CLAIMS ON BEHALF OF PLAINTIFF AND ALL CASE MEMBERS .......... 72

COUNT I: Civil Conspiracy/ Strict Products Liability (New York) .......... 72

COUNT II: Strict Liability (Defective Design) .......... 76

COUNT III : Strict Products Liability (Failure to Warn) .......... 78

COUNT IV: New York Consumer Protection Law NY Gen. Bus. Law §349 et, seq. .......... 80

PRAYER FOR RELIEF .......... 84

DEMAND FOR JURY TRIAL .......... 85

Attorney(s) for .......... 86




This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## I. INTRODUCTION

1. This is a Class Action brought on behalf of Plaintiff the Maybrook Fire District, New York, individually and on behalf of all fire districts, fire departments and all other local or municipal government entities that incurred costs to purchase and/or replace firefighter turnout gear designed, manufactured, advertised, marketed, distributed and/or sold by Defendants anywhere within the State of New York (collectively, "Plaintiff"). Defendants knew or should have known that the turnout gear contained polyfluoroalkyl substances ("PFAS") and that such chemicals pose significant risks to human health and the environment, and yet they failed to disclose these risks and continued to market the products as safe and suitable for their intended use.

2. Firefighters serve as the first line of defense in emergencies, confronting extreme and unpredictable conditions to protect lives, property, and communities.

3. To perform these duties safely, firefighters rely on specialized personal protective equipment ("PPE"), known as turnout or bunker gear ("turnout gear"), designed and engineered to shield them against one of nature's most destructive forces.

4. "Turnout gear" consists of helmets, hoods, suspenders, coats, pants, boots, and gloves. It is intended to provide thermal insulation and resistance against heat, water, and chemical exposure during fire suppression and rescue operations.

5. For many years, firefighters have faced a battle against a silent hazard and hidden threat lurking within that turnout gear: exposure to per- and polyfluoroalkyl substances ("PFAS"), commonly known as toxic "forever chemicals," which have been found to be in all three layers: the outer shell ("OS"), the moisture barrier ("MB"), and the thermal liner ("TL").



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

6. PFAS are man-made synthetic chemicals consisting of chains of carbon and fluorine bonds, widely used in turnout gear for their strength, stain resistance, grease protection, and ability to repel oil and water.

7. Because of their strong atomic bonds, PFAS are highly resistant to breakdown and persist in the environment for long periods of time, including in water, soil, and living organisms. Also known as "*forever chemicals*", PFAS are defined by the Stockholm Convention on Persistent Organic Pollutants as:

a) **Persistent** (because they do not break down through organic processes or in the environment);

b) **Transboundary** (as they migrate through surface and ground water, as well as in the atmosphere and through wildlife); and

c) **Bio-accumulative** (as they concentrate within our bodies and are passed to the fetus within the womb and though breast milk).

8. This persistence raises serious long-term concerns for public health and the environment.

9. PFAS are directly associated with multiple serious health effects, including, but not limited to, cancer, tumor development, liver, damage to the immune system, endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

10. PFAS can leach from turnout gear into a firefighter's skin and bloodstream. Exposure occurs via dermal contact with the turnout gear, the gear's shedding of PFAS during normal use, and chemical release of PFAS as the gear ages. Studies demonstrate that firefighters exhibit elevated concentrations of PFAS in their blood compared to the general population.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

11. In 2022, the International Agency for Research on Cancer classified PFAS as a Group 1 carcinogen. As a result, firefighters are exposed to a known carcinogen as part of their occupational duties.

12. Therefore, it should come as no surprise that Fire Fighter occupational cancer is the leading cause of line-of-duty deaths in the fire service.

13. At the 2022 TAFF Fallen Fire Fighter Memorial, nearly **75%** of the decorated members had died from occupational cancer.

14. Furthermore, on March 6, 2023, President Joseph R. Biden, speaking in Washington, pledged: "We're going after toxic exposure to PFAS, so-called '*forever chemicals'* that for years have been in your gear, your equipment … that you depend on to be able to do your job."[1]

15. According to the Firefighter Cancer Support Network and research conducted by the CDC and National Institute for Occupational Safety and Health, firefighters face a nine percent higher risk of being diagnosed with cancer and a fourteen percent higher risk of dying from cancer compared to the general United States population. Respiratory (lung and mesothelioma), GI (oral cavity, esophageal, large intestine), and kidney cancers account for most cases. These elevated risks are largely attributable to occupational exposures.

16. Governor Kathy Hochul proclaimed January 2025 as Firefighter Cancer Prevention Month in New York with the purpose of increasing awareness of the serious health issues that affect the lives of firefighters, arming the public and firefighters with the necessary tools and guidance to develop life-saving protocols for cancer prevention and to support those with cancer diagnoses within fire departments.

[1] *See* Robin Bravender, *'We're going after' PFAS exposure, Biden tells firefighters, E&E NEWS by POLITICO*, March 03, 2023 (last visited on April 24, 2026), https://www.eenews.net/articles/were-going-after-pfas-exposure-biden-tells-firefighters/.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

17. On December 1, 2025, President Donald Trump signed into law the Honoring Fallen Heroes Act, officially securing federal recognition of occupational cancer as a line-of-duty death for firefighters.

18. The U.S. Environmental Protection Agency (EPA) made combating PFAS contamination part of the its initiative to "Make America Healthy Again" and prioritized it among a list of top actions for the first year of the administration. EPA addresses PFAS contamination through better testing and detection, direct community support, enforcement, clear public education, common sense regulation, and advanced research so families across the nation can have a cleaner environment.

19. Fire districts, departments, municipalities and other entities, on behalf of themselves and similar situated entities, have long depended on their firefighters' turnout gear to protect them from fire and other occupational hazards. They thus reposed great trust in those who make, sell, or distribute that gear to deliver a product that could protect firefighters without exposing them to unnecessary hazards. That trust has been betrayed by manufacturers, distributors, and/or sellers. While firefighters demonstrate courage, strength, and selflessness to protect the young, the elderly, and the helpless, they have been unknowingly exposed to hidden dangers within the very equipment the Plaintiffs purchased and relied upon to keep them safe.

20. Defendants designed, engineered, manufactured, advertised, marketed, distributed, and/or sold PFAS-containing products to the Plaintiffs that are unreasonably dangerous for their intended and foreseeable use. Defendants knew or reasonably should have known that the manufactured turnout gear was and is unsafe, yet they failed to warn users and the public and continued to profit from the sale of contaminated firefighting gear.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

21. At various times from the 1950s through today, Defendants and others manufactured, distributed and/or sold PFAS contaminated turnout gear.

22. It has previously been established that 3M also knew certain PFAS were toxic all along. With Company meeting minutes dated as far back as 1978 revealing that PFOS and PFOA "**should be regarded as toxic although the degree of toxicity was left undefined**".[2]

23. Another internal communication from Defendants, The 1997 Material Safety Data Sheet, also stated:

> "**CANCER:**
> **WARNING: Contains a chemical which can cause cancer. (3825-24-1)**"
> (1983 and 1993 studies conducted jointly by 3M and Dupont).[3]

24. For decades, while fully aware of the health risks posed by PFAS products, Defendants failed to disclose to fire departments and public entities who buy and use turnout gear that the gear contained PFAS that posed significant risks to firefighters' health, property, and the environment.

25. Nevertheless, Defendants never disclosed to clients, fire departments and public entities purchasing and using turnout gear that PFAS in turnout gear is extremely dangerous to health, property, and the environment. Instead, Defendants collaborated to conceal the truth.

26. For example, defendant 3M has agreed to pay $10.3 billion to settle claims that it contaminated public water systems with PFAS, while DuPont, Chemours, and Corteva, Inc. agreed to pay $1.19 billion to settle similar claims.

---

[2] *See* Rachel Salvidge and Leana Hosea, *3M knew firefighting foams containing PFAS were toxic, documents show*, The Guardian, January 15, 2025 (last visited on April 24, 2026), https://www.theguardian.com/environment/2025/jan/15/3m-firefighting-foams-pfas-forever-chemicals-documents.

[3] *See* 3M, Material Safety Data Sheet, pg. 5 (February 7, 1997) https://www.ewg.org/sites/default/files/u352/1997_3M-Fluorade-Cancer-Warning.pdf (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

27. 3M was also involved in a $12 million class action settlement in 2022 to resolve claims they contaminated residential water sources in Alabama and a $54 million settlement with property owners in Michigan whose homes were built on toxic PFAS contaminated land.

28. In 1988, the Attorney General of Minnesota, Lori Swanson, provided relevant testimony to the US House of Representatives as a result of a lawsuit against 3M for PFAS pollution. In the testimony, Mr. Swanson provided a fax from a fire protective equipment firm to 3M dated June 1988. The fax said: "**In all literature and documentation that is published by the major manufacturers of AFFFs [and verbal presentations made by manufacturer's reps] it is claimed that these products are biodegradable … Imagine the surprise and total shock … embarrassment and credibility loss …"** at being told by others that the foams were not biodegradable after all.[4]

29. As a result of Defendant's conduct, the Plaintiff has incurred and will continue to incur substantial costs, including the cost of purchasing new PFAS-free turnout gear to replace the contaminated sets and the profit loss associated with acquiring the previous PFAS-containing turnout gear, from which the defendants continued to profit. This created a threat that the plaintiff could not avoid, leaving them with no choice but to continue purchasing and using PFAS-containing turnout gear to carry out their essential duties of saving lives and responding to emergencies. The plaintiff seeks reimbursement for these additional costs, which were incurred despite defendants' knowledge that the firefighting turnout gear contained life-threatening chemicals. The cost of turnout gear (excluding respirators) can range from approximately $3,000 to $6,000, per outfit for one firefighter. With over 1M firefighters in the United States, replacement costs could and should run into the billions.

[4] *Supra,* at Note 2.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

30. Plaintiff brings this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M"); DuPont de Nemours, Inc ("New DuPont"); The Chemours Company, and The Chemours Company FC, LLC, (together, "Chemours"); EIDP, Inc. (formerly known as E. I. Du Pont de Nemours and Company) ("Old DuPont") and Corteva, Inc. (New DuPont, Chemours, Old Dupont and Corteva, together, "DuPont"); Lion Group Inc. ("Lion"); Innotex Corp ("Innotex"); Globe Manufacturing Company, LLC ("Globe"); MSA Safety Inc. ("MSA Safety"); W.L. Gore & Associates, Inc. ("Gore"); Fire-End & Croker Corporation ("Fire-End and Croker") and Morris-Croker LLC ("Morris").

31. 3M and DuPont intentionally manufactured, distributed, marketed, and sold PFAS infused turnout gear and PFAS chemical products. 3M and DuPont also sold PFAS chemical products to performance material manufacturers and to turnout gear manufacturers, including Defendants Globe, Gore, Innotex, and Lion. Defendants manufactured, distributed, and/or sold turnout gear without disclosing to Plaintiffs and the class the dangers of the PFAS the turnout gear contained that were known to each of those entities.

32. Defendants never disclosed to fire departments, fire districts and other public entities buying and using turnout gear that PFAS in turnout gear is extremely dangerous to health, property, and the environment. Instead, Defendants concealed the truth and failed to properly warn Plaintiffs of PFAS dangers in their turnout gear.

33. Due to the persistent and long-term nature of PFAS contamination, Plaintiff has suffered and is expected to suffer damage and incur costs associated with these and other ongoing necessary remedial actions.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

34. This complaint seeks to hold Defendants accountable for their knowing and reckless disregard for firefighter health, public safety and environment, and to recoup monetary damage due to Plaintiffs' purchase of turnout gear treated/infused with PFAS.

35. Plaintiff, on behalf of a class of fire departments and responding agencies who bought PFAS-infused turnout gear, brings claims under various state laws seeking damages in the form of money for the money spent on PFAS infused turnout gear and to replace the PFAS contaminated turnout gear, equitable relief, civil penalties, and a corrective notice to all members of the class that provides a proper warning regarding the dangers of PFAS-infused turnout gear.

## II. PARTIES

### A. Plaintiff.

36. Plaintiff Maybrook Fire District ("MFD") is located in the Village of Maybrook, within the Town of Montgomery, Orange County, in the State of New York.[5]

37. The Maybrook Engine Company No. 1 is a volunteer fire department responsible for protecting approximately 4,000 residents across 4.2 square miles, including the Village of Maybrook, portions of the Town of Montgomery, and parts of the Town of New Windsor. The department operated from a single station and covers residential, commercial, and major roadway areas. It maintains multiple emergency vehicles and relies entirely on volunteers for 24/7 services.[6]

38. The organization consists of two entities: the Engine Company, established in 1914, and MFD, established in 1985.[7]

[5] Maybrook Engine Co. #1, Inc. Contact Us. https://maybrookfd.org/contact-us/ (last visited on April 8, 2026).
[6] *Id.*
[7] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

39. The MFD is a taxing entity that governs all apparatus and equipment purchases, building maintenance costs and general operating expenses.[8] It is comprised of commissioners who oversee the fire district.[9]

40. The overall mission in the department is to strive for excellence in the performance of their duty and in the service of all citizens through prevention, fire suppression, training and education.[10]

41. MFD directly purchases turnout gear for its firefighters and currently owns a total of 52 sets, with each of its 34 volunteer firefighters assigned two sets. This gear is used as intended, such as responding to all emergency response operations, including fire suppression, hazard mitigation, and other emergencies.

42. The turnout gear purchased for MFD, for example, consists of, but is not limited to, the following: helmets, gloves , pants and hoods: 1) Innotex Left Side New York City Style , Size 44" to 56";2) Left Side New York City Style , Size 30" to 44"; 3) Innotex Energy Prime- Coat and Pant- Maybrook FD, Cairns-GS110003A001-JD001; 4) Claims XR2, non-vented, yellow painted, prism silver, no-eye, bag- helmets; 5) LION V-FORCE BI-SWING REDZONE COAT; 6) LION V-FORCE HIGH-BACK REDZONE PANT; LIONV-FORCE BI-SWING COAT; 7) LION V-FORCE HIGH-BACK PANT; 8) LION Red Zone particulate hood-Black/Gray; 9) LION Red Zone particular hood-Black/Gray; 10) LFH8228f-26/LION AMERICA; 11) HD395142/LION Red Zone; 12) LFH8228F-36/LION America; 13) LION CCAX-80 EXPRE; 14) LION PCAX-80 EXPRE; 15) LION PCAX-80 EXPRE; 16) HD395142/LION Red Zone; 17) LPG955-M/LION Red Zone; 18)

---

[8] *Id.*
[9] *Id.*
[10] Maybrook Engine Co. #1, https://maybrookfd.org/ (last visited on April 9, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

LPPG55/Lion Primus GI; 19) LPG955/Lion Primus G; 20) LFH8120F-36/Lion America; ITEM; 21) LION LFH8102F HELM; 22) HOOD-C6-GORE/GORE Parti and 23) LION LFH8102F HELM.

43. MFD has directly purchased turnout gear.

44. MFD faces significant financial constraints in obtaining PFAS-free turnout gear, as available funding does not permit immediate system-wide replacement. Consequently, full replacement is projected to occur over an estimated ten-year period.

45. Plaintiff and class members have purchased, used, and continue to use turnout gear manufactured, distributed, and/or sold by Defendants in the course of providing fire protection, emergency response, and related public safety services.

46. As a result of Defendant's conduct, Plaintiff and class members have incurred and will continue to incur costs and damages.

**B. Defendants.**

**1. 3M Company ("3M'')**

47. Defendant 3M, formerly known as Minnesota Mining and Manufacturing, is a Delaware corporation that does business throughout the United States, including New York. 3M has its principal place of business in St. Paul, Minnesota.

48. 3M is a "diversified technology company with a global presence for the Safety and Industrial, Transportation and Electronics and Consumer business."[11]

49. 3M is among the leading manufacturers of products for many of the markets. Most of its products involve "expertise in product development, manufacturing and marketing, and are

[11] 3M, Annual Report 2024 (Form 10-K) (Sec File No. 1-3285), at pg. 4 (December 31, 2024). https://investors.3m.com/financials/sec-filings/content/0001308179-25-000228/mmm013312-ars.pdf (last visited on April 30, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

subject to competition from products manufactured and sold by other technologically orientated companies.[12]

50. 3M products are "sold through numerous distribution channels, including directly to users and rough numerous e-commerce and traditional wholesalers, retailers, jobbers, distributors, and dealers in a wide variety of trades in many countries around the world."[13]

**2. EIDP, Inc. ("Old DuPont")**

51. Defendants EIDP**,** Inc. ("Old DuPont") , formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States, including in New York. Old DuPont has its principal place of business in Wilmington, Delaware.

**3. DuPont de Nemours, Inc. ("DuPont'')**

52. Defendant DuPont is a Delaware corporation formed in 2015 (formerly known as DowDupont Inc.) that does business throughout the United States, including New York. New DuPont has its principal place of business in Wilmington, Delaware

53. Currently, DuPont is a global innovation leader "with technology-based materials and solutions that help transform industries and everyday life by applying diverse science and expertise to help customer advance their best ideas and delivery essential innovations in key markets including electronics, transportation, construction, water, healthcare and worker safety."[14]

54. Since 2023, DuPont has subsidiaries in about 50 countries worldwide and manufacturing operations in about 24 countries.[15]

---

[12] *Id.*
[13] *Id*
[14] Dupont De Nemours, Inc. Form 10-k (Sec File No. 001-38196), at pg. 5 (December 31, 2023). https://d18rn0p25nwr6d.cloudfront.net/CIK-0001666700/4a2166bd-aedf-41fc-ac80-eedc80198980.pdf (Last visited on April 30, 2026).
[15] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**4. The Chemours Company ("Chemours")**

55. Defendant Chemours is a Delaware corporation that does business throughout the United States, including in New York. Chemours has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary for Chemours and manufactures certain materials and/or chemicals that are the subject of this lawsuit.

56. In 2015, Defendant DuPont completed its separation of its Performance Chemicals segment through the spin-off of Chemours.[16] Once separated, Chemours became an independent, publicly traded chemical company.[17] In connection with the transfer, Chemours assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

57. Currently, Chemours is a "leading, global provider of performance chemicals that are key inputs in end-products and processes in a variety of industries"[18] They manage and report their operating results through three principle reportable segments: Thermal & Specialized Solutions, Titanium Technologies, and Advanced Performance Materials. Their Advanced Performance Materials is a "leading, global provider of high-end polymers and advanced materials that deliver

---

[16] DuPont, *DuPont Completes Spin-off of The Chemours Company. Advances Transformation to Higher Growth, Higher Value, Global Science & Innovation Company., PR Newswire*, July 01, 2015, https://www.prnewswire.com/news-releases/dupont-completes-spin-off-of-the-chemours-company-300107397.html. Quoted in Chemours, *DuPont Completes Spin-off of The Chemours Company. Advances Transformation to Higher Growth, Higher Value, Global Science & Innovation Company,* July 01, 2015. https://www.chemours.com/en/news-media-center/all-news/press-releases/2015/dupont-completes-spin-off-of-the-chemours-company (last visited on April 30, 2026).

[17] Porters Five Forces. What is Brief History of Chemours Company? (December 1, 2025) https://portersfiveforce.com/blogs/brief-history/chemours#:~:text=Chemours%20Company%20history%20traces%20back%20to%20its,inheriting%20a%20significant%20portfolio%20of%20performance%20chemicals. (last visited on April 30, 2026).

[18] The Chemours Company. Form 10-k (Sec File No. 46-4845564), at pg.44 (December 31, 2024). https://d18rn0p25nwr6d.cloudfront.net/CIK-0001666700/4a2166bd-aedf-41fc-ac80-eedc80198980.pdf (Last visited on April 30, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

unique attributes, including low friction coefficients, extreme temperature resistance, weather resistance, ultraviolet and chemical resistance, and electrical insulation."[19]

58. Chemours operates in 20 major production facilities in eight countries and serves approximately 2,500 customers across a wide range of end-markets in approximately 110 countries.[20]

**5. The Chemours Company, FC, LLC ("Chemours FC")**

59. Defendant Chemours FC is a Delaware limited liability company that does business throughout the United States, including in New York. Chemours FC has its principal place of business in Wilmington, Delawar. Chemours FC operates as a subsidiary for Chemours and manufactures certain materials such as firefighter turnout gear, and/or chemicals that are the subject of this lawsuit.

**6. Corteva, Inc. ("Corteva")**

60. Defendant Corteva, is a Delaware corporation that does business throughout the United States, including New York. Corteva has its principal place of business in Indianapolis, Indiana.[21]

61. Corteva is currently a "leading global provider of Seed and Crop Protection solutions focused on the agriculture industry and contributing to a health, more secure sustainable food supply."[22]

62. On June 1, 2019, Corteva Inc became independent , publicly traded company through the completed separation of the agriculture business of DuPont de Nemours, Inc (which was formerly known as DowDuPont Inc, a massive chemical holding company formed by the merger of Dow

---

[19] *Id.*
[20] *Id.*
[21]Corteva, Inc. Form 10-k (Sec File No.001-38710) at pg. 1 (December 31, 2024). https://www.sec.gov/Archives/edgar/data/1755672/000095017025043286/corteva_ars_2025.pdf (last visited on April 30, 2026).
[22] *Id*. at pg. 3



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Chemical and Defendant DuPont) which then split into three independent publicly traded companies: Dow (materials science), Du Pont (specialty products), and Corteva Agriscience (agriculture).

63. New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit. This Complaint refers to DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. collectively as "DuPont."

64. Corteva is currently a "leading global provider of Seed and Crop Protection solutions focused on the agriculture industry and contributing to a health, more secure sustainable food supply."[23]

**7. W.L. Gore & Associates, Inc. ("Gore")**

65. Defendant Gore is a Delaware corporation that does business throughout the United States, including in New York. Gore has its principal place of business in Newark, Delaware.

66. Gore is a global materials science company with approximately 13,000 Associated spanning five continents and thousands of products across industries, from high performance fabrics, such as firefighter turnout gear, to implantable medical devices and products.[24]

**8. Lion Group, Inc. ("Lion")**

67. Defendant Lion is an Ohio corporation that does business throughout the United States. Lion has its principal place of business in Dayton, Ohio.

---

[23] *Id*. at pg. 3
[24] Gore. The Gore Story. https://www.gore.com/about/our-story. (last visited on April 9, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

68. Lion is the largest provider of fire training equipment and facilities for first responders.[25]

**9. MSA Safety Incorporated ("MSA Safety")**

69. Defendant MSA Safety is a Pennsylvania corporation that does business throughout the United States. MSA Safety's principal office is in Pennsylvania.

70. MSA Safety is the global leader in advanced safety products, technology and solutions.

71. MSA Safety's principal product categories are fire service, detection and industrial personal protective equipment ("PPE"). Core products for fire service include self-contained breathing apparatus ("SCBA"), protective apparel, and helmets; core products for detection include fixed gas and flame detection ('FGFD") systems and portable gas detection instruments; and core products for industrial PPE include industrial head protection and fall protection devices.[26]

72. Upon information and belief, MSA Safety acquired Globe Holdings LLC , also known as Globe Manufacturing in 2017.

**10. Innotex Corp ("Innotex")**

73. Defendant Innotex is a corporation formed under the laws of Delaware that does business throughout the United States including in New York. Innotex has its principal place of business in Ohatchee, Alabama.

[25] Lion Group. Lion Protects(2026). https://www.lionprotects.com/ (last visited on April 30, 2026)
[26] MSA Safety Incorporated, Form 10-K (February 14, 2025) at pg. 4. https://www.sec.gov/ix?doc=/Archives/edgar/data/0000066570/000006657025000007/msa-20241231.htm (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

74. Innotex is a leading designer, manufacturer, and distributor of personal protective equipment and turnout gear for firefighters and first responders.[27] Innotex has three factories in Quebec, Canada, and one in Ohatchee, Alabama.[28]

75. In 2017, Innotex acquired Confections Aventures, which was a company that specialized in firefighter garment gear.[29]

**11. Globe Manufacturing Company LLC ("Globe")**

76. Defendant Globe is a New Hampshire limited liability company that does business throughout the United States, including New York. Globe has its principal place of business in Pittsfield, New Hampshire. Globe, at times relevant to this action, sold turnout gear with PFAS.

77. Upon information and belief, Globe was acquired by MSA Safety in 2017.

**12. Morris Croker LLC d/b/a Fire-End & Croker Corporation ("Fire-End and Croker")**

78. Defendant Fire End & Croker is a domestic business corporation headquartered in 7 Westchester Plaza, Elmsford, New York, United States 10523.

79. Upon information and belief, in 1959 Fire-End Products purchased the Croker Corporation, and the two companies became Fire-End and Croker Corporation joining the Morris Group International family in 2020.[30]

80. Fire-End and Croker supply for the municipal and interior fire equipment markets, with the apparel, tools, and equipment that fire, police, EMS, and other municipal workers need.[31]

---

[27] Innotex. *Production Technician-USA* (January 2025) https://innotexprotection.com/wp-content/uploads/2025/01/Production-Technician-USA-January-2025.pdf (last visited on April 30, 2026)
[28] *Id.*
[29] Innotex Acquires a Third Production Facility (October 18, 2017) https://innotexprotection.com/en/blog/innotex-acquires-third-production-facility/#:~:text=INNOTEX%20is%20an%20international%20company%20that%20designs,that%20blocks%20over%2099.99%25%20of%20carcinogenic%20particles. (last visited on April 30, 2026)
[30] FireEnd. https://www.morrisgroupint.com/fireend. (last visited on May 28, 2026)
[31] About Us. FireEnd. https://fire-end.com/pages/about-us (last visited on May 28, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

81. Defendant supplied, distributed, marketed, and/or sold turnout gear to Plaintiff throughout the State of New York.

82. Plaintiff alleges that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiff and members of the Class, as alleged herein.

83. Plaintiff alleges that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subjects of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in New York and caused harm to Plaintiff and members of the Class in New York.

84. Defendants expected or should have expected their actions to have consequences in New York.

85. Defendants purposefully availed themselves of the privilege of conducting activities in New York, thus invoking the benefits and protections of its laws.

## III. JURISDICTION AND VENUE

86. This Court has subject matter jurisdiction over this action pursuant to Article VI § 7(a) of the New York Constitution, as it is a court of general jurisdiction.

87. This Court has personal jurisdiction over Defendants pursuant to CPLR §301 and 302 because Defendants have maintained substantial contacts, and/or committed tortious acts in furtherance of the conduct alleged in this Complaint in New York. The conduct was directed at, or had the effect of causing injury to, people residing in, located in, or doing business in New York.

88. MFD has purchased Innotex turnout suits from NY Fire Equipment LLC. To find an authorized distributor for Innotex turnout gear, https://innotexprotection.com/en-ca/store-locator/,



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

enter a zip code, and the name of the distributor/dealer/ sellers for that region will come up on a map with contact information. When entering MFD's zip code of 12543, the Innotex website identifies NY Fire Equipment LLC, Skylands Area Fire Equipment & Training LLC, and Compressed Air Systems, Inc. NY Fire Equipment LLC has sold Innotex turnout gear to MFD. It is located at 46 Demarest Ave. Apt. 202, New City, NY 10956, which is approximately 37.3 miles away from MFD.

89. NY Fire Equipment LLC ("NY Fire Equipment") is an authorized dealer and distributor for Defendant's Innotex products. According to their website, it has approximately 10 sales representatives located in New Jersey, Delaware and various counties around New York, including Orange County. NY Fire Equipment has directly sold and delivered turnout gear to MFD.

90. MFD has purchased Lion turnout suits from Morris-Croker, LLC, which is operating as Fire-End & Croker Corporation, a member of Morris Group International and a major distributor of municipal fire equipment, including Lion firefighter turnout gear, located approximately 42.3 miles away from the district, demonstrating its physical proximity to the district.

91. Crocker is a premier distributor for Lion products. They supply Defendant Lion's products, such as turnout gear, to departments across the country. Lion has sales representatives in the United States, Canada and worldwide. In the United States, Lion has sales representatives all throughout the 50 states, including New York. Its products include PPE, training, total care and CBRN.

92. To locate an authorized Lion sales representative, MFD can visit https://www.lionprotects.com/find-a-sales-rep and select the appropriate country, state, and product category. For New York, United Sates, the only listed sales representative is Lion Americas.

93. MFD has purchased turnout gear directly from suppliers and/or distributors who have contact with Lion and Innotex.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

94. MFD has purchased PFAS infused turnout gear manufactured by Lion Group, and the gear was delivered to MFD in New York.

95. MFD has purchased PFAS-infused turnout gear manufactured by Innotex, and that gear was delivered to MFD in New York.

96. Defendants 3M, MSA (including Globe), and Lion directed activities toward New York through the firefighter turnout gear market served by in-state conventions like the NYSAFC Annual Conference & Fire Expo in Syracuse, a major event where firefighting equipment is marketed to New York departments.

97. The aforementioned manufacturers, distributors and/or sellers regularly exhibit and promote turnout gear at national firefighter trade shows together, participating in the same vendor networks that supply these New York expos, such as the New York State Association of Fire Chiefs Annual Conference & Fire Expo.

98. MSA/Globe and Lion manufacture turnout gear sold to fire departments nationwide, including New York, while DuPont supplies integral materials used in that turnout gear and benefits from the same distribution channels.

99. Annually, MSA Safety/Globe celebrates the Globe Gear Giveaway, a campaign in which Globe—and sometimes other partners like DuPont—provides personal protective equipment to under-resourced volunteer and mostly-volunteer fire departments in the US and Canada. Many of the winners during the years have included fire departments in the state of New York.

100. DuPont aramid fibers such as Nomex® and Kevlar® , which provide flame-resistant and structural protection in firefighter turnout gear, are used by Innotex https://innotexprotection.com/en/catalogs/fabrics/; and Lion ,



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

https://www.fireapparatusmagazine.com/firefighter-ppe/turnout-gear/dupont-and-lion-collaborate-on-ppe-materials/ which is sold to MFD and distributed in New York.

101. 3M ™ Scotchlite™ reflective trim is incorporated into firefighter turnout gear manufactured by Innotex and Lion, including coats and pants distributed and sold in New York.

102. W.L Gore & Associates and Innotex have collaborated in the development of high performance, breathable turnout gear, with Innotex integrating Gore's moisture barriers and particular-blocking liners into its structural and technical rescue suits. Gore supplies advanced moisture barrier and liner technologies that are incorporated into INNOTEX's firefighter turnout gear, which is sold and distributed in New York. https://innotexprotection.com/wp-content/uploads/2017/04/INNOTEX-Parallon_2023-avec-compression-1.pdf and https://innotexprotection.com/en/catalogs/fabrics/ .

103. W.L Gore & Associates manufactures waterproof and breathable moisture barriers, including GORE-TEX® and CROSSTECH®, and supplies, along with Stedfast Inc, a not yet named defendant, barrier composite materials to LION for use in personal protective equipment. These materials are incorporated into firefighter turnout gear that is sold and distributed in New York. https://www.lionprotects.com/hubfs/LION%20and%20Supplier%20Public%20Disclosure/2023%20LION-%20Public%20Disclosure.pdf?hsLang=en .

104. MSA Safety/Globe maintain a distribution network throughout New York, including authorized distributors such as Airgas, Colony Hardware Supply, CI, The Olympic Glove & Safety Co., A&M Industrial, Inc., and others as reflected on MSA's website https://us.msasafety.com/where-to-buy . MSA Safety also has sales representatives dedicated to servicing the New York market, who can be identified by zip code and industry segments through MSA's online locator https://us.msasafety.com/locateSalesRep.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

105. This action is brought as a class action pursuant to CPLR Article 9.

106. Venue is proper in this County pursuant to CPLR§ 503 because one or more of the parties resides in this County and/or substantial part of the events or omissions giving rise to the claims occurred in this County.

107. This action is non-removable because there is no complete diversity of citizenship, and no substantial federal question is presented.

## IV. ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### A. General Allegations Regarding Per- and Polyfluoroalkyl Substances ("PFAS")

108. Per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals") are a class of toxic man-made synthetic chemical compounds that contain long and short "chains of carbon and fluorine atoms,"[32] making them almost "indestructible."[33] Because they are nearly indestructible, they have come to be known as "Forever chemicals".

109. Many PFAS "are highly stable, water- and oil-resistant, and exhibit other properties that make them useful in a variety of consumer products and industrial processes."[34]

[32] Toxin Free USA. *What are PFAS "Forever Chemicals" and How to Avoid Them.* https://toxinfreeusa.org/education/what-are-pfas-forever-chemicals-and-how-to-avoid-them/?fbclid=IwAR3qP1JbT4v_7l_Hcjz8fWykn9VfoBOerzrDXf_S0nd3nRauhpTg3a67BQs&gad_source=1&gad_campaignid=18198204909&gclid=EAIaIQobChMI297r7afWkQMVv8KfCR3PXzcfEAAYBCAAEgJTqfD_BwE. (last visited on April 30, 2026

[33] *Id*.

[34] U.S. Environmental Protection Agency. Multi-Industry Per- and Plygluoroalkyl Substances (PFAS) Study 2021 Preliminary Report pg.1-1.
https://nepis.epa.gov/Exe/ZyNET.exe/P101348B.txt?ZyActionD=ZyDocument&Client=EPA&Index=2016%20Thru%202020&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&UseQField=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5CZYFILES%5CINDEX%20DATA%5C16THRU20%5CTXT%5C00000025%5CP101348B.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=11 (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

110. PFAS have been used for more than 80 years.[35] They were first invented in the late 1930s and proliferated through the 1940s and 1950s[36] in a variety of industries including, but not limited to, aerospace, semiconductor, medical automotive, construction, electronics, and aviation industries, as well as in consumer products (such as carpets, clothing, furniture, outdoor equipment, food packaging, etc.) and firefighting applications.[37]

111. Since the 1950s, many products "commonly used by consumers and industries have been manufactured with or from PFAS."[38] Two major commercial processes are used: (1) electrochemical fluorination ("ECF")[39] which uses electricity to replace hydrogen atoms for fluorine atoms, which are defining features of PFAS;[40] and (2) fluorotelomerization, an industrial chemical process that builds molecules called fluorotelomers that are used to create PFAS and that are the building blocks for many everyday products such as upholstery, medical garments, paint and coatings, food service paper, Class B firefighting foam and first responder gear.[41] This makes these products resistant to "water, oil, stains, and heat."[42] More than 600 intermediate processes have also been used to further produce certain PFAS.[43]

---

[35] U.S. Food % Drug Administration (December 19, 2025). *Per- and Polyfluoroalkyl Substances (PFAS).* https://www.fda.gov/food/environmental-contaminants-food/and-polyfluoroalkyl-substances-pfas#:~:text=Per%2D%20and%20polyfluoroalkyl%20substances%20(PFAS)%20are%20chemicals%20that%20resist,%2C%20and%20fire%2Dfighting%20foams. (last visited on April 30, 2026)
[36] Brennam NM, Evans AT, Fritz MK, Peak SA, von Holst HE. *Trends in the Regulation of Per- and Plyfluoroalkyl Substances (PFAS): A Scoping Review*. Int J Environ Res Public Health.Int'l J. Envtl. Res. Pub. Health, 17,18 (20), 10900(Oct. 2021) https://pmc.ncbi.nlm.nih.gov/articles/PMC8536021/ (Last visited on December 24, 2025).
[37] Robert Mueller and Kate Emma Schlosser. *History and Use of Per- and Polyfluoroalkyl Substances (PFAS) found in the Environment* (August 2020). https://pfas-1.itrcweb.org/wp-content/uploads/2020/10/history_and_use_508_2020Aug_Final.pdf (Last visited on April 30, 2026)
[38] *Id*.
[39] *Id.*
[40] Gren Science Policy Institute. *PFAS These forever "chemicals" don't break down in the environment and can harm our health*. https://greensciencepolicy.org/harmful-chemicals/pfas/ (Last visited on April 30, 2026)
[41] FluoroCouncil Global Industry Council for FluoroTechnology . *Fluorotelomers: Essential Technology, Rigorously Tested Research Analysis Confirms Safety Profile* (2019). https://portal.ct.gov/-/media/deep/pfastaskforce/ppcfluorocouncilfluorotelomersessentialtechnologyrigorouslytestedpdf.pdf (Last visited on April 30, 2026)
[42] *Id.*
[43] *Supra* 23.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

112. Through time, PFAS chemicals have grown into a class of over 12,000 chemicals, including older long chain chemicals such as Perfluorooctanoic acid ("PFOA") and Perfluorooctane sulfonate ("PFOS"), and newer chemicals made of short-chain bonds such as Gen X.[44]




***Figure 1: Overview of PFAS***[45]

113. PFAS are one of the "strongest compounds in organic chemistry."[46] They are extremely persistent in the environment and human bodies, accumulating over time and raising health concerns.[47]




---

[44] GMO/Toxin Free USA. *What are PFAS "Forever Chemicals" and How to avoid them.* https://toxinfreeusa.org/education/what-are-pfas-forever-chemicals-and-how-to-avoid-them/?fbclid=IwAR3qP1JbT4v_7l_Hcjz8fWykn9VfoBOerzrDXf_S0nd3nRauhpTg3a67BQs&gad_source=1&gad_campaignid=18198204909&gclid=EAIaIQobChMI297r7afWkQMVv8KfCR3PXzcfEAAYBCAAEgJTqfD_BwE (Last visited on April 30, 2026).
[45] *Supra* 22.
[46] *Id*
[47] National Toxicology Program U.S. Department of Health and Human Services :Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid (PFOA) or Perfluorooctane Sulfonate (PFOS) (last updates April 30, 2026). https://ntp.niehs.nih.gov/research/assessments/noncancer/completed/pfoa (Last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

***Figure 2: How do PFAS Get into the Environment?***[48]

114. In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to absorb into and bioaccumulate in the human body.

115. PFAS have been found to concentrate in human blood, bones, and organs.

116. PFAS, including PFOA, interfere with the human body's functions, including the functions of the organs and immune system, leading to adverse health outcomes.

117. The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFAS, many of which can manifest after years of exposure:

a) increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate, cancer, bladder cancer, breast cancer, and ovarian cancer.

b) reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

c) interference with the body's natural hormones and liver enzymes;

d) changes in liver enzymes;

e) reproductive effects including decreased fertility;

f) developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

g) increased cholesterol levels and/or risk of obesity;

h) increased risk of high blood pressure or pre-eclampsia in pregnant women; and

[48] State of Hawaii, Department of Health Hazard Evaluation & Emergency Response (HEER) Office Ka' Ohihana Olakino. *Per- and Polyfluoroalkyl Substances (PFASS).(*Currently undergoing updates) https://health.hawaii.gov/heer/environmental-health/highlighted-projects/pfas/ ((Last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

i) interference with and suppression of vaccine response (decreased serum antibody concentrations) in children. PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

118. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

119. According to the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (ATSDR), the "environmental persistence and mobility of some PFAS, combined with decades of widespread use, have resulted in their presence in surface water, groundwater, drinking water, rainwater, soil, sediment, ice caps, outdoor and indoor air, plants, animal tissue, and human blood serum across the globe."[49] Exposure to certain PFAS "can lead to adverse human health impacts."[50]

120. According to scientific research by the National Service Center for Environmental Publications, ATSDR, the United States Department of Commerce National Oceanic and Atmospheric Administration ("NOAA"), Chemical Aquatic Fate and Effects (CAFÉ) database, and the United States Department of Health and Human Services National Institutes of Health (NIH) Toxicology Data Network (TOXNET), there are a variety of ways that individuals may be exposed to PFAS, and some of the known exposures include: consumption of drinking water from contaminated public water systems or private wells; consumption of contaminated fish; consumption

---

[49] United States Environmental Protection Agency (EPA). *Multi-Industry Per- and Polyfluoroalkyl Substances (PFAS) Study- 2021 Prelimanry Report.* https://nepis.epa.gov/Exe/ZyNET.exe/P101348B.txt?ZyActionD=ZyDocument&Client=EPA&Index=2016%20Thru%202020&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&UseQField=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5CZYFILES%5CINDEX%20DATA%5C16THRU20%5CTXT%5C00000025%5CP101348B.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1 (Last visited on April 30, 2026)

[50] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

of crops grown in contaminated soils, particularly in agricultural areas that receive amendments of biosolids from Publicly Owned Treatment Works (POTWs); in utero exposure; consumption of contaminated breast milk by infants; inhalation and ingestion of contaminated indoor dust; and direct contact with products treated with PFAS, such as food papers/packaging and treated carpets.[51]

121. PFAS' high chemical and thermal stability have led to their use in a wide range of commercial products and industries.

122. EPA conducted a Multi-Industry PFAS Study focused on "data collection and review of PFAS manufacture, use, control, and discharge by industries that EPA determined were likely to be discharging PFAS in their wastewater in their preliminary review."[52] One of the objectives of this study was to "examine specific industrial categories and facilities manufacturing or using PFAS."[53] EPA had focused on five industrial point categories which were: organic chemicals, plastics, and synthetic fibers (OCPSF); metal finishing; pulp, paper, and paperboard; **textile mills**; and commercial airports."[54]

123. "Textile Mills" are industrial facilities that "receive and prepare fibers; transform fibers into yarn, thread, or webbing; convert yarn and webbing into fabric or related products; and or finish these materials to produce consumer products (e.g., thread, yarn, bolt fabric, hosiery, towels, sheets, carpet). "[55] The study continued to state that textile mills "use PFAS to impact outdoor gear, clothing, household fabrics, carpets, and other textile products with water, oil, soil, and heat resistances; improve cleanability of oil- and water-based stains; and as a wetting or antifoaming agent when dyeing and bleaching and as a breathable moisture barriers to wind and rain."[56]

[51] *Id*. at 3-9
[52] *Id*. at 2
[53] *Id*.
[54] *Id*.
[55] *Id*. at 54
[56] *Id*. at pg. 8-1



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Table 1. Point Source Categories Included in Multi-Industry PFAS Study

| Point Source Category | Description | Uses or Sources of PFAS[a] |
|---|---|---|
| Organic Chemicals, Plastics, and Synthetic Fibers (OCPSF) | Industrial facilities that manufacture organic chemicals, plastics, synthetic fibers or resin products, including those that manufacture PFAS or process PFAS in production of such products. Subject to ELGs in 40 CFR Part 414. | - Manufacture PFAS through electrochemical fluorination, telomerization, or other processes.<br>- Polymerization processing aids.<br>- Production of plastic, rubber, and resin.<br>- Present in manufacture of commercial chemical products (e.g., carpet cleaning sprays, cleaning agents, protective coatings). |
| Metal Finishing | Industrial facilities that change the surface of an object to improve its appearance or durability. Includes six primary operations: electroplating, electroless plating, anodizing, coating, printed circuit board manufacturing, and chemical etching and milling. Subject to ELGs in 40 CFR Part 433. | - PFAS-containing chemicals used as wetting agents, mist and fume suppressants to prevent air emissions of toxic metal fumes, agents to reduce mechanical wear, and surface coatings to impart certain characteristics (e.g., reduced corrosion, enhanced appearance). |
| Pulp, Paper, and Paperboard | Mills that convert wood into pulp, paper, paperboard, and other cellulose-based products. Subject to ELGs in 40 CFR Part 430. | - PFAS-containing chemicals used to impart products with water and grease repellency (e.g., food packaging, coated papers).<br>- Recycling of paper and paperboard products treated with PFAS. |
| Textile Mills | Mills that receive and prepare fibers; transform materials into yarn, thread, or webbing; convert yarn and webbing into fabric or related products; or finish these materials to produce consumer products (e.g., thread, yarn, bolt fabric, hosiery, towels, sheets, carpet). Subject to ELGs in 40 CFR Part 410. | - PFAS-containing chemicals used to impart outdoor gear, clothing, household, and other textile products with water, oil, soil, and heat resistance. |
| Commercial Airports | Commercial facilities associated with commercial air transport or aircraft flight operations. Excludes facilities operated by the United States Department of Defense (DOD). Subject to ELGs in 40 CFR Part 449. | - PFAS are a component of aqueous film-forming foam (AFFF), used for exterminating hydrocarbon fuel fires and firefighting training. |

a – In general, PFAS may be used as coatings or surfactants for mechanical components (e.g., semiconductors, wiring, tubing, piping, seals, gaskets, etc.) used at many types of industrial facilities.

***Figure 3: "Point Source Categories Included in Multi-Industry PFAS Study"***[57]

124. EPA's 2021 Preliminary Report stated that some textile products that may contain PFAS included "consumer apparel and accessories, **professional apparel (including medical and firefighter uniforms and personal protection equipment)**, sportwear, outdoor gear, heat-resistant gloves…"[58]

125. In 2022, the EPA initiated a proposed rulemaking to designate PFOA and other PFAS as a hazardous substance under the Comprehensive Environmental Response, Compensation, and Liability Act. In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

126. On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation (NPDWR) establishing legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water. The EPA also finalized health-based, non-enforceable

57 *Id.* at pg.2
58 *Supra* , 43



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


Maximum Contaminant Level Goals (MCLGs) for the six PFAS. Notably, the MCLGs for both PFOA and PFOS are listed as "Zero"[59]:

| Compound | Final MCLG | Final MCL (enforceable levels)[1] |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless) Hazard Index | 1 (unitless) Hazard Index |

[1] Compliance with MCLs is determined by running annual averages at the sampling point.

***Figure 4: Compliance with MCLs table[60]***

127. The EPA has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment.'"[61]

**B. General Allegations Regarding PFAS-Containing Turnout Gear**

128. Plaintiff purchased gear for employees who, as first responders to fire, hazardous materials incidents, and other emergency and medical calls, risk their lives on a daily basis. They not only save lives and protect property, but they also provide emergency services and medical care, perform rescue, and offer support to people in traumatic circumstances. To prepare them for and protect them during this enormously challenging work, fire fighters wear turnout gear and receive extensive and ongoing training in fire suppression.

129. Firefighter uniforms, also known as "turnout gear" or "bunker gear," is the personal protective equipment (PPE) used as an "essential piece of equipment for firefighters."[62] It is worn

[59] Per-and Polyfluoroalkyl Substances (PFAS) Final PFAS National Primary Drinking Water Regulation https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (Last visited on April 30, 2026)
[60] *Id.*
[61] *Id.*
[62] APX. *Understanding the Importance of Turnout Gear for Firefighters* https://apxdata.com/understanding-the-importance-of-turnout-gear-for-



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

by firefighters when responding to emergencies, and it is designed to "protect them" from the "heat, flames, and other hazards associated with firefighting."[63]

130. Turnout gear includes several components, namely helmets, hoods, coats, pants (with and without suspenders), boots, and gloves.



***Figure 5: Firefighter Turnout Gear***[64]

131. These components are made up of three layers: an outer shell, a middle moisture barrier, and an inner thermal liner.




***Figure 6: NIST PFAS Firefighting Gear Layers***[65]

firefighters/#:~:text=Bunker%20gear%2C%20also%20known%20as%20turnout%20gear,the%20head%20and%20face%20from%20falling%20debris (Last visited on April 30, 2026)

[63] *Id.*

[64] All Hands Public Safety. *All Hands Standard Structural Firefighter Package-MEN'S* https://www.allhandsfire.com/All-Hands-Standard-Structural-Firefighter-Package ) ; Fire Turnout Gear https://www.allhandsfire.com/Categories/PPE/Turnout-Gear?srsltid=AfmBOorKKVpMZFSpSQNP9zA2cgnJnOJDtlYhJfjq_8ulLqJzlZkxEpgH&page=1 (last visited on April 30, 2026)

[65] NIST. PFAS found in Firefighter Gloves, Hoods and Wildland Gear (December 17, 2024). https://www.nist.gov/news-events/news/2024/12/pfas-found-firefighter-gloves-hoods-and-wildland-gear (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

132. These multiple layers are designed to "protect the firefighter from heat, flames, and other hazardous conditions."[66]

133. The outermost layer, known as outer shell, is "typically made of durable material such as Nomex and Kevlar"[67] and/or polybenzimidazole fibers which are treated with a durable water repellent (DWR) finish.[68] This layer is said to protect the firefighter "from flames, and provides abrasion resistance." It can also "repel water and other liquids."[69]

134. The moisture barrier is "waterproof and breathable, allowing sweat to escape while preventing water from entering," which helps in keeping the firefighter "dry and comfortable during prolonged exposure to moisture."[70]

135. Lastly, the thermal barrier provides "insulation against heat," and it is usually made "of aramid fibers or treated fibers that can withstand high temperatures which prevents burns and heat transfer into the skin.[71] The turnout gear also consists of an innermost layer that "provides a barrier between the firefighter's skin and other layers assisting in regulating the body temperature."[72] It is the closest to the firefighters skin.

---

66 Wear ARMR. Demystifying Firefighter Turnout Gear (May 7, 2024) https://weararmr.com/awareness/demystifying-firefighter-turnout-gear (last visited on April 30, 2026)
67 *Id.*
68 Heather M. Stapleton ,et.al. Per- and Polyfluroalkyl Substances (PFAS) and Brominated Flame Retardants (BFRs) in Firefighter Turnout Gear: Two Chemial Classess of Concern to Consider (Last visite on April 30, 2026) ;https://pubs.acs.org/doi/10.1021/acs.estlett.5c01153 (last visited January 7, 2026)
69 *Supra*, 50
70 *Id.*
71 *Id.*
72 *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.




***Figure 7: Jacket & Pant Layers- Function***[73]

136. Peer-reviewed scientific research has confirmed that all three layers of the turnout gear contain PFAS.[74]

137. According to a study conducted in 2015 and published in 2025 by the American Chemical Society, PFAS were detected in all firefighter garments (OS, MB and TL) manufactured between 2013 and 2020.

138. In 2020 a group of physicists at the University of Notre Dame conducted a study on PFAS substances in firefighter textiles (the "Peaslee study").[75] The collected samples ranged in manufacturing age between 2022 and 2017, and several unused (never-worn) samples obtained from 2007, 2008 and 2017. The remainder samples were out-of-service (used) turnout gear from 2002-2014. In addition, 11 material swatches were obtained from textile manufacturers that represented new (in 2018) thermal liners used in fabrication of turnout gear.[76] Active-duty PPE specialists with three different fire departments located in California, Georgia, and Indiana assisted in the identification of fabrics used in the donated samples. All materials sampled were designated

[73] *Id.*
[74] Andrew C. Maizel et al. *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles* (Nat'l Inst. Of Standards & Tech. Tech. Note TN 2248, May 2023), https://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.2248.pdf. (last visited on April 30, 2026)
[75] Graham F. Peaslee, et al., "Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles," Environmental Science & Technology Letters 2020, 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410 . (last visited January 7, 2026).
[76] *Id* at pg. 1



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

specialty fabrics produced from four of the major specialty textile manufacturers in the US, including Defendants Gore (Newark, DE), and Milliken and Company (Spartanburg, SC).[77]

139. The samples used for the Peaslee study included Defendants Globe, Lion, and Honeywell, among others.

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

Table S1. The type and number of turnout gear samples used in this study.

***Figure 8: Peaslee study Turnout Gear sample manufacturer list***[78]

140. In the Peaslee study, the researchers found significant quantities of PFAS in every layer of both new (still in the original packaging) and used turnout gear.[79]

141. In "every textile sample tested," the researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in both the moisture barrier and outside shell layers.[80]

142. The turnout gear also contained significant levels of a number of other PFAS, including Polytetrafluoroethylene ("PTFE") and PFOA. PTFE "is one of the most well-known and applied PFAS used in the moisture barrier" of the firefighting turnout gear.[81] PFOA is a synthetic,

[77] *Id.*
[78] Graham F. Peaslee, et al, *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles* at pg. 2. https://pubs.acs.org/doi/suppl/10.1021/acs.estlett.0c00410/suppl_file/ez0c00410_si_001.pdf (last visited on January 7, 2026).
[79] *Id.*
[80] Graham F. Peaslee, et al, Environmental Science & Technology Letters, *Supporting Information for : Another Pathway for Firefighters Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles* (download date January 23, 2020) at pg. B. https://www.sffcpf.org/wp-content/uploads/2020/06/6.23.2020-DR-PEASLEE-STUDY-ANOTHER-PATHYWAY-FOR-FIREFIGHTER-EXPOSURE-TO-PFAS-FIREFIGHTER-TEXTILES.pdf (last visited on January 7, 2026).
[81] *Replacing PFAS in Firefighter Turnout Gear, Greener Solutions.* UC Berkely Fall 2022, Slife 5 (2022)(PowerPoint Slides) https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf (last visited January 7, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

long lasting chemical belonging to the PFAS group, use to make products heat, oil, water and stain resistant."[82]

143. In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle-induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.[83]

144. The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

145. When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

146. As a result of the study, in all three layers of tested turnout gear, PFOA was present at alarmingly high levels—for instance, in one set of gear that was tested, the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion.

147. The amount of PFOA present in the turnout gear that was tested was 182,000 parts per trillion (182 parts per billion) in the outer shell and 78,000 parts per trillion (78 parts per billion) in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[84]

148. The International Agency for Research on Cancer has classified PFOA, a type of PFAS, as "carcinogenic to humans" based on strong evidence that it has some of the key properties

---

[82] United States Environmental Protection Agency. Technical Fact Sheet- Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA) (Nov. 2017). https://19january2021snapshot.epa.gov/sites/static/files/2017-(12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf (last visited on April 30, 2026)
[83] *Id.*
[84] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) 

of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

149. Lead researcher Graham Peaslee commented that firefighter turnout gear is composed of "the most highly fluorinated textiles [he had] ever seen"[85] and that the level of PFAS in the turnout gear means that fire fighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high[.]"[86]

150. In May 2023, the NIST , one of the US's oldest physical science laboratories, and an organization that is currently part of the US Department of Commerce, conducted a research study that measured PFAS levels in new, off-the-shelf firefighter turnout gear, including jackets, pants, gloves, helmets, and self-contained breathing apparatus.[87] The study found that the "amount of PFAS present varies widely between manufacturers and layers, but the highest PFAS concentrations were consistently observed in the outermost 2 layers of turnout gear coats and pants."[88]

151. Furthermore, in January 2024, NIST followed up on the research and measured the same jackets and pants textiles that it used in its May 2023 studies and found "measured PFAS after the gear had been stressed in ways that mimic typical wear and tear while a firefighter was on duty."[89] This follow-up study "subjected these components of turnout gear to abrasion, heat, laundering and weathering."[90] The results demonstrated that "abrasion, weathering, and heat caused measured

---

[85] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS* , Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26. (last visited January 7, 2026).
[86] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear* , Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear (last visited on April 30, 2026)
[87] *Supra*, 59
[88] *Id.*
[89]U.S. Fire Administration Working for a fire-safe *America, Results of First 2 National Institute of Standards and Technology Studies on PFAS in Turnout Gear* (February 1, 2024) https://www.usfa.fema.gov/blog/results-of-2nd-nist-study-on-pfas-in-turnout-gear/ (Last visited on April 30, 2026)); Andrew C. Maizel et al. *Per- and Polyfluoroalkyl Substances in Firefighter Turnout Gear Textiles Exposed to Abrasion, Elevated Temperature, Laundering, or Weathering,* (Nat'l Inst. Of Standards & Tech. Tech. Note TN 2260, Jan 2024) https://www.nist.gov/publications/and-polyfluoroalkyl-substances-firefighter-turnout-gear-textiles-exposed-abrasion (January 16, 2024)
[90] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

PFAS concentrations to increase."[91] Washing them had little effect. In some cases, it did reduce PFAS concentrations, presumably because "PFAS were washed away into the wastewater."[92] This report was in response to the National Defense Authorization Act for Fiscal Year 2021 titled "Guaranteeing Equipment Safety for Firefighters Act of 2020".

152. Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters, with dermal absorption through direct contact between the firefighters' skin and turnout gear being "a key exposure route."[93]

153. On March 2025, NIST published another study related to PFAS in turnout gear, using an advanced laboratory technique used to identify a broad range of chemical substances in complex samples, in this case to search for the presence of over 4,000 PFAS in firefighter turnout gear textiles.[94]

154. In this follow up study to NIST's January 2023 study, NIST examined 17 firefighter turnout gear moisture barrier, outer shell, and thermal liner textiles for the presence of 4,900 PFAS from the NIST PFAS Suspect List.[95] This list represents a structure (and other identifiers) of possible PFAS substances.[96]

155. This study provided "insight into the PFAS present in the firefighter turnout gear by greatly expanding the chemical diversity of PFAS that can be identified compared with typical

[91] *Id*. at pg. 35
[92] *Id*.
[93] G.E. Campbell, et al., *PFAS-free Moisture Barriers in Structural Firefighting Gear, in Toward a PFAS-free Future: Safer Alternatives to Forever Chemicals,* Green Chemistry Series No. 81 (Simona A. Bălan, Thomas A. Bruton, and Kimberly G. Hazard, ed., 2024).
[94] Andrew Maizel et. al. Suspect Screening of Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles, NIST TN 2334 (March 2025), at pg. 1 https://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.2334.pdf (last visited on April 30, 2026)
[95] *Id.*
[96] Benjamin Place. Suspect List of Possible Per- and Polyfluoroalkyl Substances (PFAS) (rev. 2023-01-05) https://data.nist.gov/od/id/mds2-2387 (last visited on January 7, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

targeted analytical approaches and detecting PFAS that are not commonly included in targeted PFAS analyte lists."[97]

156. The study concluded that six PFAS were "identified with high confidence in at least one textile including four which were not previously reported" in NIST studies.[98]

157. In December 2025, "Environmental Science and Technology Letters" published an article on PFAS and Brominated Flame Retardants ("BFRS") in firefighter turnout gear. BFRS are other man-made chemical compounds containing bromine that are added to consumer products and have been used historically in textiles and other polymers, to impart flame resistance. Both PFAS and BFRS are "added to textiles and other products to reduce flammability."[99] Some studies have demonstrated that the "exposure to the chemicals has been associated with negative health effects including cancer, thyroid disease and neurodevelopmental problems."[100]

158. The study sought to "quantify and compare levels of PFAS and BFRS in firefighting turnout gear used by firefighters in the US to provide insights into potential exposure.[101] The study targeted "older gear that was likely to contain PFAS based on their date of manufacture, and three sets of recently purchased turnout gear that were advertised as non-PFAS treated with a non-ePTFE based MB."[102] It specifically collected and used "firefighter turnout gears (10 jackets and pants) that were donated for testing by fire service partners in California, Maryland and North Carolina."[103]

---

[97] *Supra*, 95 at pg. 38.
[98] *Id.*
[99] Duke Nicholas School of the Environment. *Study Documents Potentially Hazardous Flame Retardants in Firefighter Gear* (December 16, 2025). https://nicholas.duke.edu/news/study-documents-potentially-hazardous-flame-retardants-firefighter-gear (last visited January 7, 2026).
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] Heather M. Stapleton, et, al. *Per- and Polyfluoroalkyl Substances (PFAS) and Brominated Flame Retardants (BFRs) in Firefighter Turnout Gear: Two Chemical classes of Concern to Consider* (December 16, 2025). https://pubs.acs.org/doi/10.1021/acs.estlett.5c01153 (January 7, 2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

Nine of the garments were manufactured before 2022 and the other three garments were purchased in 2024 and were advertised as non-PFAS ("PFAS free") treated and non-ePTFE moisture barrier.[104]

**Table S1.** Turnout gear items tested in this study and their respective information reported on the NFPA label of each garment.

| Group | Sample # | Type | Date of Manufacture | Outer Shell | Moisture Barrier | Thermal Liner |
|---|---|---|---|---|---|---|
| A | 1 | Jacket | 06/2015 | Advance™, Tan | Crosstech® Black 2F | Defender® M SL2 |
| | 2 | Jacket | 10/2013 | Gemini™ XT, Gold | Crosstech® 3-Layer, 4A | Caldura® NPi |
| | 3 | Jacket | 08/2014 | Advance™ | Crosstech® Black 2F | Glide™ Gold 2 Layer |
| B | 4 | Pants | 02/2016 | KombatFlex™ | Stedair® Gold | Glide™ PBI G2™ |
| | 5 | Jacket | 02/2016 | KombatFlex™ | Stedair® Gold | Glide™ PBI G2™ |
| | 6 | Jacket | 06/2016 | KombatFlex™ | Stedair® Gold | Glide™ PBI G2™ |
| C | 7 | Jacket | 10/2020 | Gemini™ XT | Stedair® 4000 | Glide Ice™ 2 Layer |
| | 8 | Jacket | 12/2020 | Gemini™ XT | Stedair® 4000 | Glide Ice™ 2 Layer |
| | 9 | Jacket | 05/2020 | Gemini™ XT | Stedair® 4000 | Glide Ice™ 2 Layer |
| D (Advertised as Non-PFAS treated) | 10 | Jacket | 03/2024 | PBI Quilt™ | Stedair® Clear | Glide Ice™ 2L PBI |
| | 11 | Pants | 03/2024 | PBI Quilt™ | Stedair® Clear | Glide Ice™ 2L PBI |
| | 12 | Jacket | 03/2024 | PBI Quilt™ | Stedair® Clear | Glide Ice™ 2L PBI |

***Figure 9: The 12 Turnout Gear samples tested***[105]

159. Even though the study does not identify the specific manufactures, a few manufacturers, including a defendant, have been linked to the manufacture of the turnout gear with the layers as specified in the above table.

160. PFAS were detected in all garments manufactured between 2013 and 2020; the highest concentrations were observed in the outer shells of each garment.[106] The three-garment manufactured in 2024 and advertised as non-PFAS treated contained trace levels of PFAS in each layer, indicating that the PFAS likely originated from background contamination.[107] However, BFRS were found in higher levels in all 12 garments. [108]

[104] *Id.*
[105] Supporting Information. *Per- and Polyfluoroalkyl Substances (PFAS) and Brominated Flame Retardants (BFRs) in Firefighter Turnout Gear: Two Chemical classes of Concern to Conside*r (December 16, 2025). at pg.7 https://pubs.acs.org/doi/suppl/10.1021/acs.estlett.5c01153/suppl_file/ez5c01153_si_001.pdf (January 7, 2026).
[106] *Supra*, 92
[107] *Id.*
[108] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 




***Figure 10: Result of Analyses- PFAS***[109]

161. Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[110] Occupational cancer is presently the leading cause of line-of-duty death in the fire service.

162. In 2013, more than 60% of firefighter line-of-duty deaths are attributed to occupational cancer.[111]

163. From 2015 to 2020, 75% of the fire-fighters added to the International Association of Firefighters ("IAFF") Fallen Fighter Memorial died from occupational cancer.[112]

164. PFAS exposure has been linked to many serious adverse health effects in humans, including not only cancer, but tumors, liver damage, immune system and endocrine disorders, high

---

[109] *Id.*
[110] *supra* note 12
[111] NIOSH, NIOSH Firefighter Cancer Study Finds Higher Cancer Rates Among U.S. Firefighters, *NIOSH Firefighter Cancer Study Finds Higher Cancer Rates Among US Firefighters.*(October 17, 2013) https://www.sffcpf.org/niosh-study-of-firefighters-finds-increased-rates-of cancer/#:~:text=Cancer%20is%20now%20the%20leading,are%20attributed%20to%20occupational%20cancer.(last visited April 30, 2026)
[112] Office of the Illinois State Fire Marshal & Office of the Governor of Illinois, JB Pritzker and Matt Perez, *OSFM Encourages Firefighters to Schedule Regular Screenings/Physicals to Help Reduce Cancer Related Deaths* (Jan. 21, 2022) at pg.1. https://www.illinois.gov/content/dam/soi/en/web/illinois/iisnewsattachments/24416-osfm-encourages-firefighters-to-schedule-regular-screenings-physicals-to-help-reduce-cancer-related-deaths.pdf (April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induce hypertension.

165. Plaintiff and the class members purchased their turnout gear in good faith, believing that neither they nor their firefighters would be exposed to contamination from the chemicals that Defendants manufactured and failed to warn about.

**C. Defendants' Contributions to PFAS-Containing Turnout Gear**

166. In 1938, a chemist employed by Defendant DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

167. By the 1950's PFAS were widely used in commercial manufacturing, including by Defendants 3M and Dupont. Prior to the 1950s, PFAS had never been detected in the bodies or blood of human beings.

168. Since the 1950s, 3M and Dupont have continued to manufacture, market, and sell PFAS.

169. In 1966, Defendant Globe began manufacturing, marketing, and selling turnout gear containing PFAS.

170. Since 1966, Globe has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, and PFAS manufactured by Defendants 3M and/or DuPont.

171. In 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

172. In 1970, Defendant Lion began manufacturing, marketing, and selling turnout gear containing PFAS.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

173. Since 1970, Defendant Lion has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont and Gore and PFAS manufactured by Defendants 3M and/or DuPont.

174. In 2013, DuPont announced that it was planning to spin off its "performance chemicals business" into a new publicly traded company, which ultimately became Defendant Chemours.

175. In 2015, Chemours began manufacturing, marketing, and selling performance chemicals, including PFAS.

176. Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals, including PFAS.

177. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the turnout gear purchased and distributed to firefighters by Plaintiff and other members of the Class, and/or the PFAS-containing materials therein, and/or the PFAS therein.

178. Defendants 3M and DuPont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff and members of the Class.

179. Defendants 3M, DuPont, and Gore expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff and members of the Class.

180. Defendants Globe and Lion expected their turnout gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff, their firefighters and members of the Class.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### D. Defendants' Knowledge of PFAS Dangers

#### 1. Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS

181. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

182. 3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

183. As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont), but they were not publicized or shared with any regulatory agencies. Notably:

a. In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

b. In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

c. By the 1970s, 3M had documented PFAS in fish and were aware that PFAS were hazardous to marine life.

d. In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

e. In 1978, 3M conducted multiple PFAS studies in monkeys and rats. The studies showed that PFAS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

f. In 1979, an internal 3M report stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."

g. In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

h. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

i. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

j. In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

184. Section 8(e) of the Toxic Substances Control Act (TSCA) requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in the TSCA since its enactment in 1976. See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

185. Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

186. In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

187. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOA and other PFAS.

188. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."

189. In 2006, the United States Environmental Protection Agency ("EPA") launched a PFOA Stewardship Program because of concerns "about the impact of PFOA and long-chain PFAS on human health and the environment, including concerns about their persistence, presence in the environment and in the blood of the general U.S. population, long half-life in people, and developmental and other adverse effects in laboratory animals."

190. The program invited eight major companies in the PFAS industry (Arkema, Asahi, BASD Corporation, Clarian, Daiking, 3M/Dyneon, DuPont and Solvay Solexis) to commit "to reducing PFOA from facility emissions and product content by 95 percent no later than 2010, and work towards eliminating PFOA from emissions and product content no later than 2015."



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

Additionally, EPA had issued regulations, known as the Significant New Use Rules (SNURs), "requiring manufacturers and processors of these chemicals to notify EPA" of new uses before they were commercialized.

191. The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M fell far short of transparency: Mike Roman, 3M's chairman and chief executive officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve." In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."

192. Following 3M's "voluntary phase out" of PFOS, EPA "took prompt regulatory actions in 2002 and then 2007 under the Toxic Substances Control Act ("TSCA") to limit any future manufacturer or importation of 271 PFAS chemicals."[113]

193. After 2015, manufacturers phased out earlier PFAS compounds, and replaced them with reformulated "short-chain" PFAS.[114]

**2. Defendant DuPont's Long-Standing Knowledge of PFAS Dangers**

194. Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

195. Dupont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

---

[113] Id.

[114] The University of Rhode Island. Stepp: Sources, Transport, Exposures & Effects of PFAS. *Progress: Are PFAS being phased out?* https://web.uri.edu/steep/pfas/progress/#:~:text=Even%20as%20we%20phase%20out,suspected%20problems%20with%20several%20more. (Last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

196. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[115]

197. In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[116]

198. As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

a) In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.[117]

b) In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.[118]

c) In 1978, Dupont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and

[115] Sheron Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception* , The Intercept (Aug. 11, 2015), https://theintercept.com/2015/08/11/dupont-chemistry-deception/ . (last visited on April 30, 2026)
[116] *Id.*
[117] *Id.*
[118] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

measuring the levels of PFOA in the blood of its own workers, noting adverse patterns, including increased rates of endocrine disorders.[119]

d) By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[120]

e) In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

f) By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[121]

g) By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h) In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided

---

[119] *Id.*
[120] *Id.*
[121] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[122]

i) In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.[123]

199. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[124]

200. In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

201. In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures,"[125] beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk

[122] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare* , The New York Times Magazine (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html (last visited on April 30,2026)

[123] *Supra*, at Note 115

[124] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit Meeting Minutes (June 30, 2000), https:// www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.(last visited on April 30, 2026)

[125] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding *Re: Perfluorooctanoic acid (PFOA)* (April 29, 2003). https://cdn.toxicdocs.org/QX/QXnogko6Eaqd8wNkE3Mj7rvRo/QXnogko6Eaqd8wNkE3Mj7rvRo.pdf. (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

> assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia. …
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[126]

202. In 2005, the EPA reached a settlement with Dupont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

203. In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90% of its active litigation to Defendant Chemours.

204. In 2019, Paul Kirsch, then-president of the fluor products business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

205. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit … We

[126] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

look forward to vigorously defending our record of safety, health and environmental stewardship."[127]

### 3. The Remaining Defendants' Knowledge of the Dangers of PFAS

206. Defendant Gore openly advertises that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."[128] For example, in efforts to garner support for its open, long-standing commercial use of PTFE, Gore asserts:

> The present paper brings together fluoropolymer toxicity data, human clinical data, and physical, chemical, thermal, and biological data for review and assessment to show that fluoropolymers satisfy widely accepted assessment criteria to be considered as "polymers of low concern" (PLC) and to show that fluoropolymers are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes. Scientists, regulators, and concerned communities often fall into one of two groups: one says all PFAS should be banned and the other says PFAS are so different that each must be evaluated, classified, and regulated individually. Barbara J. Henry, PhD, a toxicologist with [Gore], says there's a middle way forward if PFAS are grouped by their properties.[129]

207. Defendants have continued to misrepresent the safety of PFAS and engaged in campaigns aimed at directing the public's attention away from the issue of PFAS in their products.

208. Defendant 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[130]

209. 3M maintains and publicly advertises that:

> Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition … . While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions.[131]

---

[127] *California sues 3M, DuPont over toxic 'forever chemicals'* , CNN (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont (last visited on April 30, 2026)
[128] *Gore's Commitment to Material Stewardship* , GORE, https://www.gore.com/about/materials-stewardship (last visited on April 30, 2026)
[129] *Id.*
[130] *Health, Safety & Environmental Stewardship* , 3M, https://pfas.3m.com/health-safety-and-environmental-stewardship (last visited on April 30, 2026)
[131] *How Fluorochemistries Are Safely Used* , 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used. (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

210. Defendant New DuPont maintains and publicly advertises that:

> In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[132]

211. Defendant Chemours maintains and publicly advertises that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030."[133] Chemours further maintains and publicly advertises that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[134]

212. In 2017, Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's *retraction* of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish … . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts … would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear. … We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks … .

---

[132] *DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)* , DuPont, https://www.dupont.com/pfas.html (last visited on April 30, 2026)
[133] Fluoropolymers and Fluorinated Gases Can and Must be Manufactured Responsibly, Chemours (2025), https://www.chemours.com/en/pfas-advocacy/responsible-manufacturing#:~:text=The%20real%20solution%20for%20addressing,met%20with%20action%20and%20progress. (last visited on April 30, 2026)
[134] *Our Commitment to Responsible Chemistry* , CHEMOURS, https://pages.chemours.com/TIO2-CRC.html (last visited April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

However, the elevated risks derives from the hazardous substances produced by the fire, not the turnout gear that protects firefighters.[135]

213. In 2017, Defendant Lion launched its "NOT IN OUR HOUSE" initiative to "spread awareness of the cancer threat facing the fire service" and "educating firefighters on the actions they can take to reduce their exposure to cancer-causing agents."[136]




***Figure 11: Defendant Lion Advertisement "Stop cancer at the door"***[137]

214. In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action."[138]It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job":[139]

---

[135] Schwartz, Stephen A., President, Lion Group, Inc., Letter to the Editor, *Columbus Dispatch* (Oct. 30, 2017), https://www.fireengineering.com/wp-content/uploads/2020/09/letter-to-columbus-dispatch.pdf (last visited April 30, 2026)

[136] Lion Protects, "Not In Our House," *Lion Protects*, https://www.lionprotects.com/not-in-our-house (last visited April 30, 2026)

[137] *Id.*

[138] E&ENews by Politico. *Firefighters face lies, 'phony' studies on PFAS exposure*. https://www.eenews.net/articles/firefighters-face-lies-phony-studies-on-pfas-exposure/#:~:text=In%20a%20July%20phone%20call,attention%20of%20San%20Francisco%20firefighters. (last visited April 30, 2026)

[139] Customer Safety Alert: PFOA and Turnout Gear.,Lion, at pg. 1 https://www.fireengineering.com/wp-content/uploads/2020/09/pfoa-lion.pdf (last visited April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)





***Figure 12: Defendant Lion "Customer Safety Alert PFOA and Turnout Gear"[140]***

215. Lion continues to promote that safety is its top concern.




***Figure 13: Defendant Lion "Comfort, Safety and Durability" Marketing[141]***

216. In 2018, Defendant Gore's toxicologist Barbara J. Henry prepared an updated analysis and an assessment that incorporated EPA's 2016 study on estimated cancer risks associated with potential exposure to PFOA for firefighters wearing a complete kit of turnout gear and the pre-2013

[140] *Id.*
[141] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Gore components in turnout gear.[142] The analysis concluded that the potential exposures and associated risks of cancer effects were insignificant.[143]



**Summary of PFOA Exposure Assessment**
**for Pre-2013 Gore Component in Firefighting Gear**

*This document was prepared by W. L. Gore and Associates for use by its associates, customers and other specified individuals to assist in better understanding Gore's materials and their attributes. This document and the information included in it should not be shared with any third party without the prior engagement and permission of W. L. Gore and Associates.*

**Summary**

After a multi-year technical program, the Gore Fabrics Division succeeded in eliminating PFOA from its supply chain and products in 2013. Because firefighting gear can be used for ten years, an updated analysis incorporating EPA's 2016 human equivalent dose for cancer effects was conducted to estimate cancer risks associated with potential exposures to PFOA for firefighters wearing a complete kit of turnout gear and the pre-2013 Gore Components in turnout gear. The analysis shows that these potential exposures and associated risks of cancer effects are insignificant.

***Figure 14: Extract from full Summary prepared by Defendant W.L. Gore[144]***

217. In 2020, Paul Chrostowski, Ph.D., a consultant hired by Defendant Lion, took out a full page in the publication Firefighter Nation to argue that turnout gear was completely safe and that any evidence to the contrary, including the Peaslee study, was unreliable fearmongering. Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population … . At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.[145]

---

142 BBarbara J. Henry,Ph. DSummary of PFOA Exposure Assessment for Pre-2013 Gore Component in Firefighting Gear (April 20, 2018)at pg. 1 https://legacy-assets.eenews.net/open_files/assets/2021/02/17/document_gw_08.pdf (last visited April 30, 2026)

143 *Id.*

144 *Id.*

145 Chrostowskiaul, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims, Firefighter Nation* (June 3, 2020), https://www.firefighternation.com/health-wellness/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/ (last visited April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)


The evidence from these studies shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population. The federal Agency for Toxic Substances and Disease Registry (ATSDR) stated in its most recent guidance, "Dermal absorption of PFAS through the skin is limited and is of minimal concern as an exposure route." They also state "Epidemiological and toxicological research on PFAS as a risk factor to human health is ongoing. The correlation of PFAS as human health risks are building a body of evidence. However, the evidence does not establish a causal relationship between PFAS exposure and disease."[3]

A common misperception is that all PFAS are the same. But in fact, federal guidelines based on the most current scientific research treats the exposure limits for these materials differently based on the type of chemical being discussed. There are many differences between how PFAS materials get in the bloodstream, how fast they leave the body, and where they come from.

Moreover, the connection between PFAS and cancer is extremely weak. The few peer-reviewed epidemiological studies that have found an association were not statistically significant and inconsistent with other studies. Studies in laboratory animals were similarly equivocal and only revealed cancer at extremely high doses and only for PFOA which is not found in turnout gear. There have been no published clinical or epidemiological studies showing an increase in cancer among firefighters that could be attributed to PFAS exposure.[4]

To put this into context, it is important to realize that we, all members of the general public, are constantly exposing ourselves to low doses of potentially hazardous substances on a daily basis, but the low level of these exposures do not cause health risks. For example, we absorb acrylamide from consuming cooked foods. The mere fact of exposure does not by itself mean a chemical causes a disease, but scientists look at different levels of exposure and study those levels of exposure and their association with a negative health effect and many other scientific criteria. Epidemiological studies are complex scientific procedures that must be carefully performed in controllable conditions and must be reproducible and verifiable by the scientific community.

Another common misperception that needs to be corrected is referring to drinking water standards when discussing firefighter protective clothing. While the drinking water limits appear to be low, the exposure limits for water are based on lifetime exposures to drinking water, very different from the scenarios involving the wearing of turnout gear for which dermal absorption does not occur for PFAS trace substances.

Finally, the major manufacturers of outer shell materials, thermal barriers, and moisture barrier components that are used in nearly all turnout gear sold today have received certificates of compliance to the independent Swiss organization OEKO-TEX's Standard 100 for PPE and Materials for PPE. The OEKO-TEX certification process tests for the presence of unsafe levels of trace materials, including PFOA. The requirements in the OEKO-TEX standard 100 are based on the most current European safety regulations. In 2019, the NFPA PPE Technical Correlating Committee established at task group that is currently working on setting a North American standard for restricted substances in firefighter protective clothing.

At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

***Figure 15: Firefighter Nation "Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims" Article Snip[146]***

218. In 2021, Defendant Lion confirmed that the representations articulated by Chrostowski reflect the company's position.[147]

Lion consultant Paul Chrostowski has continued to tell fire departments that the Exponent studies "basically showed that this fabric and this turnout gear is safe to use."

***Figure 16: EENEWS "Firefighters Face Lies, Phony Studies on PFAS Exposures" Article snip[148]***

219. In 2021, Defendant Gore maintained in a New York Times article that its turnout gear products were safe for wearers.[149]

---

146 *Id.*

147 Wittenberg, Ariel, Firefighters Face Lies, Phony Studies on PFAS Exposure, *E&E News* (Feb. 17, 2021), Firefighters face lies, 'phony' studies on PFAS exposure - E&E News by POLITICO (Last visited April 30, 2026)

148 *Id.*

149 Tabuchi, Hiroko, Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic, *The New York Times* (Jan. 26, 2021), updated Oct. 20, 2021, https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html (April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

W.L. Gore said it remained confident in the safety of its products. MSA Safety did not respond to a request for comment.

***Figure 17: New York Times "Firefighters Battle an Unseen hazard: Their Gear Could be Toxic" Article Snip***

220. In 2022, Defendant 3M assured the public of PFA safety and stated that PFAS "are critical in the manufacture of many products that are important in modern life…3M's products are safe and effective for their intended uses."[150]

221. As per the above, Defendants have advertised to the Plaintiff and the public that their products are safe for their intended uses, and that there is no risk of PFAS causing health risks, like cancer.

222. For example, Defendant DuPont maintains and publicly advertises that turnout gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out,"[151] "help protect professionals even when the fire is out,"[152] and "are helping keep first responders safe."[153]




[150] 3M News Center. 3M to Exit PFAS Manufacturing by the End of 2025 (December 20, 2022). https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025#:~:text=3M%20to%20Exit%20PFAS%20Manufacturing,term%20value%20for%20our%20shareholders.%22 (Last visited April 30, 2026)
[151] *DuPont Technology in Your Turnout Gear*., Dupont (2019)., https://www.dupont.co.uk/knowledge/dupont-technology-in-your-turnout-gear.html (last visited on April 30, 2026)
[152] *Id.*
[153] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

*Figure 18: DuPont Personal Protection Snip*[154]




*Figure 19: DuPont Personal Protection "The first choice for all your protection needs" Snip*[155]

223. Defendant Globe maintains and publicly advertises that the company is "committed to firefighter health & safety"[156] and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.[157]




*Figure 20: Globe "Committed to Firefighter Health & Safety" Webpage*[158]

---

154 *Id.*
155 *Id.*
156 *H2T Head to Toe Health.*, MSA https://us.msasafety.com/firefighter-health?locale=en (Last visited on April 30, 2026)
157 *Id.*
158 *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.




***Figure 21: MSA "A Changing World"[159]***

224. Defendant Gore maintains and publicly advertises that the company's protective fabrics enable fire fighters "to stay safe and engaged,"[160] emphasizing that to do their jobs, fire fighters "need protective garments that keep them protected with a limited amount of physiological burden."[161]




***Figure 22: Gore-Tex Professional Fabrics Fire & Rescue and Law Enforcement Webpage[162]***

First responders have physical jobs. From firefighters and emergency responders to law enforcement officials and SWAT teams, public safety officers venture into the most dangerous environments imaginable — and to do their jobs, they need protective garments that keep them protected with a limited amount of physiological burden.

***Figure 23: Gore-Tex Fire & Rescue law Enforcement[163]***

---

159 *Id.*
160 *Fire & Rescue and Law Enforcement.*, Gore., https://www.gore.com/industries/fire-rescue-law-enforcement (Last visited April 30, 2026)
161 *Fire & Public Safety/Police.*,Gore., https://www.gore.uk/indstries/fire-public-safety-police (Last visited April 30, 2026)
162 *Id.*
163 *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

225. Another manufacturer, Honeywell, maintains and publicly advertises that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

226. In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

227. Defendant Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty", emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

228. Defendant Innotex specializes in the development, manufacture and distribution of turnout gear for firefighters.

229. Innotex advertised its product as one of "quality and innovation as well as to firefighter safety."[164] Innotex informs the public that they use "state-of-the-art materials and construction techniques in designing and manufacturing the most advanced turnout gear in the industry".[165]

230. As part of Innotex's recommendations for use and care of INNOTEX turnout gear, they state "as any responsible manufacturer, we continuously monitor industry trends, including the evolving topic of PFAS. These chemicals, which are also present in everyday products, help turnout gear protect our customers and perform essential functions required by them."[166]

[164] Innotex. *Safety: Handle with Care*. (2026) https://innotexprotection.com/en/safety/ (last visited April 30, 2026)
[165] *Id.*
[166] *Id.*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

231. Innotex continued to inform the public about PFAS, its dangers, and Innotex's solutions to assist with these chemicals. Innotex informed the public that US government agencies, which focus on health and safety to the public, did not prohibit the use of PFAS because they were widely used in many products "where their benefits are appreciated and demanded by consumers."[167] They further advertised, as shown above, the benefits of PFAS such as that the chemicals "resist and repel oil, stains, heat and water" and that "companies and brands such as Defedants Goretex, and 3M continue to supply Innotex with their products for use and incorporation in turnout gear."[168]

## FAQs

**Are PFAS dangerous?**

Agencies such as the EPA, CDC and OSHA have not prohibited the use of PFAS as they are widely used in many products where their benefits are appreciated and demanded by consumers. For example PFAS among others resist and repel oil, stains, heat and water. Companies and brands such as GoreTex, Teflon and 3M continue to supply us with their products for use and incorporation in turnout gear.

**Where else are PFAS found?**

According to the CDC, PFAS are found in many products, including grease-resistant paper, fast food containers/wrappers, microwave popcorn bags, pizza boxes, candy wrappers, non-stick cookware, stain-resistant coatings used on carpets, upholstery, and other fabrics, water-resistant clothing, cleaning products, personal care products (shampoo, dental floss) and cosmetics (nail polish, eye makeup), and in paints, varnishes, and sealants.

**What is INNOTEX doing about PFAS?**

We purchase materials from large multinational corporations that are specialized in supplying products used in the production of turnout gear. We continually monitor available products that can meet the needs of our front-line defender in terms of comfort, protection, and durability, among others.

INNOTEX always employs proven state-of-the-art materials in manufacturing its turnout gear. As members of the NFPA, we continually monitor all developments that can yield the most benefits for our customers. This includes reviewing guidelines and recommendations not only from our suppliers, but also from experts and independent agencies and associations such as the IAFF.

232. Distributor and/or seller, Fire-End & Croker Corp, has been a major distributor of turnout gear, such as Lion.[169]

233. Before it became Fire-End & Croker Corp, Croker Fire Prevention had manufactured, assembled, and distributed fire protection equipment for over a century.[170]

234. Defendant Fire-End & Croker distributed and sold PFAS contaminated turnout gear from major manufacturers such as Lion Group, Honeywell and Innotex. Stating in their page " Lion manufactures the turnout gear that emergency service providers, militaries, and civilian responders, require to stay safe in the line of duty. Seven of the ten largest fire departments in the US and twenty-

167 *Id.*
168 *Id.*
169 FireEnd. Turnout Gear. https://fire-end.com/collections/turnout-gear. (last visited on May 28, 2026).
170 Croker. About Us. https://www.croker.com/about-us (last visited on May 28,2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

five of the top 50 wear Lion turnout gear. In 2019, FDNY awarded their contract to Lion to protect the firefighters in the nation's largest city."[171]

235. The company states it is a "dominant force" in the municipal and interior fire equipment markets and supplies apparel, tools, and equipment to firefighters and municipal workers throughout the world, including New York.[172]

236. Both FireEnd and Croker have existed for many years. FireEnd promotes and advertises itself as follows: "For over 100 years, we've protected and served emergency and first responders, military personnel, and more. We proudly carry reputable brands of firefighter gear and supplies."[173]

237. FireEnd and Croker have distributed and sold PFAS-contaminated turnout gear in New York.

**4. Defendants' Failure to Provide Safety Warnings on Product Labels**

238. As alleged above, the turnout gear does not contain any labelling information or warnings:

a) indicating that the gear contains or may contain PFAS,

b) indicating that the gear specifically contains or may specifically contain PFOA,

c) regarding the health risks associated with exposure to PFAS, or

d) regarding the health risks associated with exposure to PFOA.

---

[171] Supra, at note 170.

[172] FireEnd. About Us. https://fire-end.com/pages/about-us (last visited on May 28, 2026)

[173] FireEnd. https://fire-end.com/?srsltid=AfmBOoqIhbjuSz-K_Qns5F8dnFMVfsGGZflbYZOYP1zxZ6YDh7Cfwm3k (last visited on May 28,2026).



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

239. Below are photos[174] typical of warning labels for turnout gear designed, manufactured, marketed, sold, and distributed by Globe, Honeywell, and Lion. As depicted below, the labels do not disclose that the turnout gear contains PFAS or PFAS-containing materials, and contain no warning that handling, wearing, or using the turnout gear as it was intended to be handled, worn, or used can result in exposure to PFAS and adverse effects to human health.




***Figure 25: Globe Firefighter Suits Turnout Gear Label***[175]

[174] Globe G-Xtreme Jacket Turnout Gear-44 x 36-mfg.2010.,Ebay., Morning Pride Turnout Gear black., Ebay., https://www.ebay.com/itm/266970825681?chn=ps&norover=1&mkevt=1&mkrid=711-117182-37290-0&mkcid=2&mkscid=101&itemid=266970825681&targetid=2295557533350&device=c&mktype=pla&googleloc=9060351&poi=&campaignid=21388819155&mkgroupid=173029508548&rlsatarget=pla- (last visited April 30, 2026) https://www.ebay.com/itm/293489566865; Lion Janesvilles Model Nacy2K XL Lines Turnout Gear Unused MFG 11/2013., https://www.worthpoint.com/worthopedia/lion-janesville-model-navy2k-xl-lined-3847251238 (last visited on April 30, 2026)
[175] Ebay. Globe G-Xtreme Jacket Turnout Gear- 44 x 36-Mfg.2010 https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwjq5KeOwfqRAxX4KlkFHW8gBRsQFnoECCYQAQ&url=https%3A%2F%2Fwww.ebay.com%2Fitm%2F293489566865&usg=AOvVaw2J_EhHzcaHfr6LIe_06yoN&opi=89978449 (Last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.




*Figure 26: Lion Group Turnout Gear label*[176]




*Figure 27: Lion Group*

176 Ebay. Lion Janesville 4032XS TR51 Rescue Coat Navy Blue. https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwjQmKr5wfqRAxWBD1kFHToeDLAQFnoECBgQAQ&url=https%3A%2F%2Fwww.ebay.com%2Fitm%2F255813687603&usg=AOvVaw0wEx9Qb9hMnKoyxwzPnL3A&opi=89978449 (Last visited April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.




*Figure 28: Innotex Energy Label*




*Figure 29: Innotex Energy TR20 Tech Rescue Label*[177]

[177]Ebay. Innotex Energy TR20 Tech Rescue Turnout Pants https://www.ebay.com/itm/167015634355?_skw=Innotex+energy+prime+turnout+gear&itmmeta=01KP8SCQ0R56BVV6HTZK78Z4J4&hash=item26e2e855b3:g:iCUAAOSw3GNl1tBo&itmprp=enc%3AAQALAAAABAGfYFPkwiKCW4ZNSs2u11xBBqfR9yuLoTdwXOZaFe1XlnmY%2FBxcXY2MHmfhYmbJTQ8GLwWmMFr%2BNC2UzokWtZeWljwnNcpPvZAnUBvlLML3xnHL11CZ2fpemLDPyEE9GhtPkvxVN7iGS0G2bTk4%2BAqd%2FQasTHaEI5WdG5Elms9aioUA1akRLc%2FoSTfIUUA037L3KdiWABhl92oiTYH%2F1M4OZqEfhU5k2LIBjtzKKA4cX2iP7--tO%2B2q5AUe%2Btlvdeei1gjV68pPX0XM5C6BZvDp0bND%2BLXR6GLMc7mVE%2FBm2ExtUHBYEYbEu6PSft2unGR6PKoKVNpQNyW9boY3qnnI%3D%7Ctkp%3ABk9SR77wspmyZw (last visited April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.




***Figure 30: Inno-Tex Turnout Firefighter Brown Jacket Coat Yellow Tape Warning Label[178]***

**5. Defendants' Ability to Design Safer Turnout Gear**

240. PFAS-free turnout gear was, at all relevant times, technologically and economically feasible.

241. In fact, certain companies now offer PFAS-free options for waterproof fabrics, durable fabrics, and/or outer shells in turnout gear.

242. For example, in or around 2021, Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential of providing "waterproofing in its consumer outdoor clothing products"[179]

[178]Ebay. Inno-Tex Turnout Firefighter Brown Jacket Coat https://www.ebay.com/itm/267138833952?_skw=Innotex+energy+prime+turnout+gear&itmmeta=01KP8SCQ0R8SB9NN2W5ZH3GME0&hash=item3e32b71e20:g:wVMAAOSw1ChnmVkr&itmprp=enc%3AAQALAAABAGfYFPkwiKCW4ZNSs2u11xAznuHmh7KO%2FqwBRcrSgErvC5TXfUEYneLkaYzjshbIcrfxMQJtG7Byed6tEInxgo84iT9P%2FIpbdLuO3XyJzJ4cxtvFdR5domT6i8ExqyuewbtqMwomTvxpgBGE8KQNRGo5%2BDbH%2BQ2IOwbML58hwn2qtPYqePNy2dsjYUcc%2BVbT7J5bMtXPNAhaD2wv64nkzT9Z0p9IDNmFOiNbe8zGR7pm0n247xQ96yzlvm1Csc5kxi45deqEHs%2FZqckcNWKI%2FQImDYIxu1g%2F1fP5JXT44G2IJkJ6f2%2BhL6YW%2BSNi0lbeONY7hdjKDyP8UNCmmOMjnTM%3D%7Ctkp%3ABk9SR8DwspmyZw (Last visited April 30, 2026)

[179] Toxic-Free Future. *Gore-Tex manufacturer announces availability of new PFAS-free membrane but still uses "forever chemicals" to make its gear outdoor apparel and gear* (September 30, 2021) https://toxicfreefuture.org/press-room/gore-tex-manufacturer-announces-availability-of-new-pfas-free-membrane-but-still-uses-forever-chemicals-to-make-its-outdoor-apparel-and-gear/#:~:text=Health%20advocates%20call%20for%20a,to%20contribute%20to%20PFAS%20pollution. (Last visited on May 5, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

243. In or around 2021, Todd Herring, Vice President of Product Innovation and Strategy at Fire-Dex, stated in a press release that the company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials … that meets the increasing market demand for PFAS free PPE material options."[180]

244. In or around 2021, Deana Stankowski, Senior Offering Manager for first responder gear at Honeywell spoke out about Honeywell's newly available PFAS-free outer shell layer "options," explaining: "We are making sure that we have every PFAS-free outer shell available in the market as *part of our portfolio* …. We have customers field testing PFAS-free outer shells, and we will eventually transition over completely to PFAS free." Stankowski added:

> There's no reason to offer both options … . Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way … . The color fastness and wear remain the same.[181]

245. In or around 2022, a group of students at UC Berkley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in turnout gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of fire fighter turnout gear.[182]

[180] *Fire-Dex Launches Non-Fluorinated PPE Fabrics* , Firehouse (Feb. 19, 2021), https://www.firefighternation.com/firerescue/fire-dex-launches-non-fluorinated-ppe-fabrics/ (last visited on April 30, 2026)

[181] Ronnie Wendt, *Innovations in Turnout Gear* , Industrial Fire World (Mar. 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear .(last visited April 30, 2026)

[182] Grace Campbell, Sophia Glazer, Britanny Stinger, Sophie Thompson & Mackenna Thompson, *Finding Safer Alternatives to the PFAS-free Moisture barrier in Structural Firefighting Gear, Greener Solutions Fall 2022 (*UC Berkeley, December 16, 2022), https://bcgc.berkeley.edu/sites/default/files/firefighterturnouts_5361947_84950761_final_report.pdf, at 22 and 23 (last visited on April 30, 2026)



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk. 

**Finding Safer Alternatives to the PFAS-free Moisture Barrier in Structural Firefighting Gear**

Grace Campbell, Sophia Glazer, Brittany Stinger, Sophie Thompson, McKenna Thompson

Greener Solutions Fall 2022, UC Berkeley
December 16th, 2022

***Figure 28: Finding Safer Alternatives to the PFAS-Free Moisture Barrier in Structural Firefighting Gear Article***

While there are potential concerning health impacts related to ethylene, once ethylene is synthesized into a polymer it will pose a significantly lower risk to the firefighter population. As there are no Group I Human Endpoints associated with the polymer, and it is not likely to degrade into its monomer form, we believe PE is a viable laminate alternative to the PTFE moisture barrier. Since PE is one of the most commonly used plastics in the world and widely studied, we suspect data gaps are of limited concern rather than a gap in knowledge.

***Figure 29:*** **Snip from** ***Finding Safer Alternatives to the PFAS-Free Moisture Barrier in Structural Firefighting Gear Article***

Considering our findings from both the technical performance and hazard assessments together, we recommend the following. Regarding the science-side of our solution, the silicon-based flame retardant coatings could be incorporated with any of the three fibers: cellulose fibers, short-chain PHAs, or graphene. Alternatively, the polyethylene laminate could be applied to one of the listed fibers. Regarding the policy-side of our solution, we advise the NFPA to drop the light degradation and viral penetration tests and keep the remaining standards. The light degradation & viral penetration tests result in an over-engineered moisture barrier and limit viable PFAS-free options. A key aspect of our challenge was to find an alternative that met these updated technical performance criteria, without making a regrettable substitution. We aimed to balance both the health hazard criteria and technical performance in determining the viability of our alternatives.

***Figure 30: Snip from Finding Safer Alternatives to the PFAS-Free Moisture Barrier in Structural Firefighting Gear Article***

246. Defendants designed, manufactured, marketed, advertised, distributed, and/or sold turnout gear containing PFAS.

247. At all relevant times, Defendants knew or should have known that PFAS are persistent chemicals associated with significant health and environmental risks.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

248. Despite such knowledge, Defendants continued to incorporate PFAS into the design of the turnout gear and its component materials, such as textiles and fabrics; advertise the gear as safe ; and distribute and/or sell the gear to Plaintiffs, and class members.

249. Defendants failed to adopt safer alternative design, materials, technologies, or manufacturing methods despite the foreseeable risks associated with the continued use of PFAS in turnout gear for years.

250. Furthermore, defendants further failed to adequately disclose or warn Plaintiffs and class members regarding the presence of PFAS in the turnout gear and risks associated with the continued use of the PFAS in turnout gear, and if certain PFAS were incorporated, risks associated with it were not disclose to the Plaintiffs and members.

251. Had Defendants provided adequate warning regarding the presence of PFAs and the associated risks, Plaintiffs and class members would have been able to make informed purchasing , budgeting, replacement, and risk management decisions regarding the turnout gear, including evaluating PFAS-free or PFAS reduced alternatives as such products became available and taking measures to reduce unnecessary PFAS exposure.

252. Plaintiffs and class members were deprived of information necessary to evaluate the risks associated with PFAS-containing turnout gear.

253. Adequate warnings would have enabled Plaintiffs and Class members to assess the risks associated with continued use of PFAS containing turnout gear, plan for the replacement of such products, evaluate PFAS-reduced alternatives as they became available, and implement reasonable measures to reduce unnecessary PFAS exposure and/or incurred in additional costs.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

254. By failing to adopt safer design and by failing to provide adequate warnings, Defendants deprived Plaintiffs and Class members of material information and cause them to purchase and continue using PFAS contaminated turn out gear, resulting in economic losses.

## V. CLASS ALLEGATIONS

1. Plaintiff brings this action as a class action on behalf of all fire districts, cities, villages, towns and/or other local or municipal government entities that incurred costs to purchase and/or replace firefighter turnout gear designed, manufactured, advertised, marketed, distributed and/or sold by Defendants anywhere within the State of New York (the "Class') during the Class Period.

2. Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

3. The Class satisfies the numerosity, commonality, typicality, adequacy, and superiority criteria of CPLR § 901 for maintaining a class action.

4. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

5. **Ascertainability.** The proposed Class is readily ascertainable because it is defined using objective criteria so as to allow class members to determine if they are part of the Class. Determining whether a potential class member is a fire district, city, village, towns and or other local or municipal governmental entity that purchases or uses turnout gear is a straightforward and objective matter. The members of the class can also be readily identified through records and information in Defendants' possession, custody, or control.

6. **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of class members.

7. **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a) Whether Defendants engaged in the conduct alleged herein;

b) Whether Defendants designed, advertised, marketed, distributed, supplied , sold, or otherwise placed PFAS products into the stream of commerce in the State of New York;

c) Whether Defendants knew about the dangers of PFAS and, if so, how long they have known;

d) Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount;



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

e) Whether Defendants breached their duty to warn the members of the Class of, and protect the members of the Class from, the long-term health risks and consequences of exposure to high levels of PFAS; and

f) Whether Defendants violated applicable state laws.

8. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiff, and each member of the Class were directly caused by Defendants' wrongful conduct, and Plaintiff and members of the Class assert similar claims for relief. The costs incurred by Plaintiff in acquiring or replacing PFAS-contaminated turnout gear parallel the costs incurred by other class members.

9. **Adequacy.** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel has any interest adverse to those of the other members of the Class.

10. **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action is manageable. Plaintiff knows of no special difficulty this Court is likely to encounter in the maintenance of the action that would preclude its maintenance as a class action.

## TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS
## DISCOVERY RULE TOLLING



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

11. Defendants had knowledge of the hazard to the health and safety of Plaintiff, and Class members, caused by exposure to PFAS Chemicals for decades.

12. Beginning in the 1960s and continuing through to the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

13. Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiff, and Class members, by designing, manufacturing, and selling turnout gear that was infused with PFAS

14. Defendants intentionally concealed this information from Plaintiff, Class members, and the public.

15. Defendants intentionally and continuously misrepresented the safety of the turnout gear, PFAS-contaminated materials, and/or PFAS therein, assuring firefighters, the government, and the public that the turnout gear, PFAS-contaminated materials, and PFAS were safe.

16. At all relevant times, Plaintiff and the Class members did not know or have reason to know of the Defendants' conduct that caused PFAS contamination.

17. Neither Plaintiff nor any other Class members through the exercise of reasonable care could have discovered the conduct by Defendants alleged herein. Further, Plaintiff and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

18. For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff and the Class members.

## VI. FRAUDULENT CONCEALMENT TOLLING

19. Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiff, and Class members, for decades.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

20. Because of Defendants' active and ongoing concealment of the hazards of PFAS Chemicals, and the unique dangers posed to fire fighters through dermal absorption, ingestion, and inhalation of PFAS Chemicals through off-gassing and migration, Plaintiff could not have reasonably discovered the causes of action alleged herein.

21. For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein and/or any statute of limitations that otherwise may apply to the claims of Plaintiff or Class members should be tolled.

## VII. CLAIMS ON BEHALF OF PLAINTIFF AND ALL CASE MEMBERS

### COUNT I: Civil Conspiracy/ Strict Products Liability (New York)

22. Plaintiffs adopts and realleges each and every allegation contained in the preceding paragraphs as set forth herein.

23. Defendants manufacturers, distributors and/or sellers working together for decades agreed to commit numerous unlawful acts relating to the design, manufacture, marketing, advertisement, distribution and/or sale of firefighter turnout gear containing PFAS chemicals that were known to be toxic, bio-persistent, carcinogenic, and environmentally hazardous. Defendants also agreed to use unlawful means to commit lawful acts as part of this manufacturing, distribution and/or sale of PFAS contaminated turnout gear.

24. At all relevant times, Defendants 3M Company and DuPont created PFAS chemicals and incorporated them into firefighter-protective components, including materials used in turnout gear.

25. At all relevant times, MSA Safety, Globe Manufacturing, Gore, Innotex, Lion and others designed, manufactured, marketed, distributed, and/or sold firefighter turnout gear incorporating PFAS-containing materials supplied directly or indirectly by chemical manufacturers.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

26. Defendants possessed superior and exclusive knowledge regarding the presence of PFAS in the turnout gear and the associated health risks and dangers posed by exposure to PFAS.

27. Defendants agreed to pursue the unlawful act of knowingly misrepresenting the safe and protective nature of the PFAS turnout gear distributed and sold through fire districts, fire departments, counties, cities and the rest of the state of New York.

28. Defendants knew or should have known that PFAS are hazardous to human health and the environment and that exposure to PFAS could cause serious injury to firefighters and the general public.

29. 3M, DuPont and other major manufacturers controlled, reviewed, accessed, and/or were otherwise aware of scientific literature, internal testing, industry studies, governmental guidance, and toxicological data concerning the persistence, bioaccumulation, and toxicity of PFAS materials incorporated into the firefighter turnout gear and the risks it posed to firefighters.

30. Despite such knowledge, manufacturers, distributors and/or sellers continued to engage in the acts of manufacturing, marketing, advertising, distributing and selling PFAS-containing turnout gear without adequately warning firefighters, fire departments, fire districts, municipalities, and others regarding nature, presence, release, exposure pathways, and health hazards associated with PFAS.

31. The PFAS turnout gear at issue was defective and unreasonably dangerous when used in its intended and reasonably foreseeable manner because the turnout gear contained hazardous PFAS chemicals and lacked adequate warning, instructions, safer alternative designs, and appropriate disclosures concerning known and foreseeable risks.

32. Defendants had a duty to disclose to the Plaintiff, its members, and the general public the material facts regarding the presence and dangers of PFAS in the turnout gear, by virtue of their



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

superior knowledge, as this information was not available to the public and was essential to the safe use and purchase of the turnout gear.

33. Despite this duty, Defendants knowingly and intentionally concealed and failed to disclose the material facts regarding the presence and hazardous nature of PFAS-containing turnout gear and to mislead the public including Plaintiff and class members;

34. Defendants, individually and in concert with one another, entered into an agreement and common scheme to conceal and suppress information regarding the presence and dangers of PFAS in the turnout gear from the Plaintiff, class members and the public, with the intent to induce reliance on the safety and suitability of the turnout gear;

35. Defendants conspired to violate the New York Consumer Protection Law § 349 by marketing, distributing, and selling PFAS-containing firefighter turnout gear while concealing and failing to disclose the presence, hazards, and foreseeable health risks assorted with PFAS exposure to consumers.

36. Defendant Fire-End & Croker Corporation acted as distributor, supplier and/or authorized dealer of firefighter protective equipment, including PFAS-containing turnout gear, that was placed into the stream of commerce and sold to Plaintiffs , class members

37. In furtherance of the conspiracy, Defendants committed over acts within New York, including but not limited to:

a. Selling or supplying turnout gear to government entities in New York while failing to disclose the presence of PFAS in the turnout gear in product labeling, marketing materials, and safety data sheets;

b. Coordinating internal communications to suppress test data and adverse findings regarding PFAS migration from turnout gear;



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

c. Jointly developing or approving misleading safety statements asserting that PFAS containing turnout gear was safe for routine firefighter use;

d. Distributing uniform technical documents, marketing materials, and product specifications omitting known PFAS hazards;

e. Manufacturing and supply PFAS chemicals for use in firefighter protective equipment;

f. Incorporating PFAS into turnout gear materials and components;

g. Marketing and selling such products as safe and suitable for firefighter use;

h. Concealing, suppressing, or failing to disclose material information regarding PFAS exposure risk to Plaintiffs, class members and the rest of the consumers in New York.

38. Plaintiff, and class members reasonably and justifiably relied on Defendant's concealment and misrepresentations regarding the safety of the turnout gear and the absence of harmful forever chemicals such as PFAS.

39. Defendants agreed to manufacture, distribute and/or sell PFAS-contaminated turnout gear and avoid warning the public to achieve the lawful purpose of maximizing revenue and profit.

40. Defendants' deceptive conduct affected the public interest and had a broad impact on consumers.

41. As a direct and proximate result of Defendants' conspiracy, Plaintiff, its members, and the general public were repeatedly exposed to PFAS chemicals during the normal and intended use of the turnout gear, thereby subjecting them to risks of harm and injury, having incurred and



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

continuing to incur substantial costs for the purchase and replacement of the turnout gear supplied by Defendants.

42. As a consequence, Defendants are jointly and severally liable for the manufacturing, distribution, and/or selling of PFAS-contaminated turnout gear.

43. WHEREFORE, the Plaintiff and class members demand judgement holding Defendants jointly and severally liable for all damages arising from their conspiracy and their intentional concealment of PFAS hazards associated with the firefighter turnout gear.

**COUNT II: Strict Liability (Defective Design)**

44. Plaintiff adopts and realleges each and every allegation contained in the preceding paragraphs as set forth herein.

45. Defendants, as manufacturers, distributors and/or sellers of firefighter turnout gear containing PFAS, and/or its chemical precursors, owed a duty to Plaintiff, its members, and other foreseeable users to ensure that such gear was reasonably safe in design for its intended and foreseeable use;

46. Defendants' products were unreasonably dangerous for their reasonably anticipated use for the following reasons:

a. PFAS chemicals cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, and economic welfare

c. PFAS create real and potential environmental damage and health risks, including terminal and permanent diseases such as cancer, tumors, liver



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

damage, endocrine disorders, birth defects and others as mentioned in this complaint.

d. Defendants failed to disclose these threats to fire departments, Plaintiff, class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS infused products.

47. Defendants had a duty not to place PFAS-containing products in the stream of commerce if they were unreasonably dangerous, and that duty extended to all foreseeable users, including Plaintiff, class members, and the general public.

48. At all relevant times, the PFAS-infused turnout out gear was in defective and unreasonably dangerous condition to Plaintiff and its members, beyond what an ordinary consumer would expect when the product was used in an intended or reasonably foreseeable manner.

49. Plaintiff and members used turnout gear infused with PFAS as intended.

50. At all times, Defendants and other manufacturers could produce products that did not contain PFAS and/or its associated chemicals and precursors. Reasonably available alternative designs for PFAS-free turnout gear existed that would have permitted firefighters to safely perform their duties, and these alternatives would accordingly have prevented the Plaintiff and members of the class from incurring consistent financial losses associated with contaminated gear, along with the risks to members and the general public from the contaminated gear.

51. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

52. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

53. These and other acts by Defendants were a direct and proximate cause of damages to Plaintiff and class members.

54. As a direct and proximate result of Defendant's unreasonably dangerous design of PFAS-infused products, Plaintiff, class members, and the public have suffered injuries and incurred financial losses, including, but not limited to, the costs of replacing contaminated gear and expenses associated with the purchase of such contaminated gear.

55. WHEREFORE, the Plaintiff and class demand full, fair, and just compensation for their damages and the costs of this action and all such additional relief that this Court deems appropriate.

**COUNT III : Strict Products Liability (Failure to Warn)**

56. Plaintiff adopts and realleges each and every allegation contained in the preceding paragraphs as set forth herein.

57. Defendants, as manufacturers, distributors, and/or sellers of PFAS- infused turnout gear, had a duty to provide adequate warnings of the hazardous, toxic, and latent dangers associated with PFAS, including but not limited to the risks of serious harm to human health and the environment arising from the foreseeable use, handling, wear, and misuse of the turnout gear. These dangers include the potential of exposure through routine and intended use of the turnout gear, resulting in the release, absorption, and accumulation of PFAS in the human body and surrounding environment.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

58. Defendants knew or should have known of the above hazards based on available scientific knowledge, and they failed to provide adequate warnings or instructions to mitigate such risks. This duty to warn extended to all persons and entities foreseeably exposed to such hazards, including Plaintiff, class members, and the general public.

59. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS- infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

60. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

61. Defendants' PFAS-infused products were defective by virtue of their inadequate warning at the time they left Defendant's control, and those PFAS products reached the Plaintiff , class members and the general public without substantial change in their condition.

62. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Plaintiff, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Plaintiff and members used their turnout gear with PFAS-infused products as intended.

63. These and other acts by Defendants were a direct and proximate cause of damages to the Plaintiff, class members and the community.

64. WHEREFORE, the Plaintiff and class demand full, fair, and just compensation for the damages and costs of this action and all such additional relief that this Court deems appropriate.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

**COUNT IV: New York Consumer Protection Law NY Gen. Bus. Law §349 et, seq.**

65. Plaintiff adopts and realleges each and every allegation contained in the preceding paragraphs as set forth herein.

66. New York law forbids deceptive conduct or practices in carrying out any business, trade, or commercial activity, as well as in providing services. See N.Y. Gen. Bus. Law § 349.

67. Defendants' conduct violated New York Consumer Protection Statute General Business Law § 349.

68. As manufacturers, distributors and/or sellers of PFAS-infused products, Defendants had a duty not to act negligently in placing into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including Plaintiff and class members, who might be foreseeably exposed and harmed by PFAS-infused products.

69. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS chemicals cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner;

b. PFAS contamination poses significant threats to public health, and economic welfare;

c. PFAS create real and potential environmental damage and health risks, including terminal and permanent diseases such as cancer, tumors, liver damage, endocrine disorders, birth defects and others as mentioned in this complaint;



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

d. Defendants failed to disclose these threats to fire departments, Plaintiff, class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS infused products.

70. At all relevant times, PFAS-infused turnout gear was in a defective condition, unreasonably dangerous to the Plaintiff and class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

71. At all relevant times, Plaintiff and class members used turnout gear infused with PFAS as intended.

72. Defendants knew of these risks and nevertheless failed to use reasonable care and acted negligently in the design and manufacturing of their PFAS- infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous the public.

73. At all relevant times, the foreseeable risks of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

74. Defendants' PFAS-infused products were defectively designed at the time they left Defendant's control, and those products reached the consumers without substantial warnings and design change in their condition.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

75. Defendants violated New York's deceptive trade practices laws by distributing an unsafe product; explicitly and implicitly assuring consumers that the gear was safe; failing to alert users to its hazardous defects; creating confusion about the risks of PFAS and the turnout gear; and intentionally making false or misleading claims or withholding key information about its safety.

76. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Plaintiff and class members have been injured resulting in substantial financial burdens, including increased costs, expenses, and other economic losses to Plaintiff and Class members.

**COUNT V: New York Consumer Protection Law NY Gen. Bus. Law §350 et, seq**

77. Plaintiff adopts and realleges each and every allegation contained in the preceding paragraphs as set forth herein.

78. New York General Business Law §350 provides, in relevant part, that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

79. At all relevant times, Defendants engaged in the regular course of trade and commerce in New York by designing, manufacturing, marketing, distributing, supplying and/or selling firefighter turnout gear to consumers in New York.

80. In connection with the marketing an sale of such products, Defendants disseminated advertising, labeling, promotional materials, technical specifications, product representations, safety communications, and/or marketing statements that expressly and/or impliedly represented that the firefighter turnout gear was safe, protective, durable, and suitable for its intended occupational use to firefighters and the environment.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

81. Upon information and belief, such representations were materially false, deceptive, and misleading because Defendants failed to disclose, omitted, and/or concealed material facts concerning the presence of PFAS in the turnout gear, including the fact that PFAS are synthetic, persistent, and bioaccumulative chemicals associated with serious adverse health risks, including increased risks of cancer, and other diseases and harm from the occupational exposure.

82. Defendants further failed to disclose material information regarding the foreseeable release, degradation, and exposure pathways of PFAS during normal use, maintenance, contamination, and wear of firefighter turnout gear, including repeated dermal contact.

83. Defendants' advertising and promotional statements created the false and misleading impression that the turnout gear was fully safe for firefighter use and did not expose users to undisclosed PFAS materials that posed foreseeable health risks.

84. Defendants' false advertising was widespread, uniform, and part of a continuous course of conduct affecting the public interest, and the same or substantially similar representations were made across product lines, marketing materials, and sales channels nationwide, including within New York.

85. Defendant's conduct was willful, knowing, and in reckless disregard of the rights, safety, and health of Plaintiff and class members, thereby warranting all available statutory and equitable relief.

86. Plaintiff and Class Members have been damaged by these violations and are entitled to treble damages and recovery of attorneys' fees under N.Y. Gen. Bus. Law § 350-e.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and class members demand judgment against Defendants, jointly and severally, as to the FIRST, SECOND, THIRD, FOURTH, and FIFTH Causes of Action, awarding Plaintiff and class members amounts that exceed the jurisdiction of all lower Courts:

i. Compensatory and treble damages in an amount sufficient to fairly and completely compensate Plaintiff and class for all damages as allowed by law; and

ii. punitive damages.

iii. Treble damages

iv. attorneys' fees.

v. interest, costs and disbursements; and

vi. such and further relief as this Court may deem just and proper



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury as to all issues so triable as a matter of right.

Dated: June 4, 2026
Santurce, Puerto Rico

Respectfully submitted,

NAPOLI SHKOLNIK

/s/ Hunter J. Shkolnik
Hunter J. Shkolnik
hunter@nsprlaw.com

/s/ Nestor D. Galarza
Nestor D. Galarza
ngalarza@nsprlaw.com
/s/ Rebeca Martínez
Rebeca Martínez
rmartinez@nsprlaw.com
NAPOLI SHKOLNIK
1302 Avenida Ponce De León
Santurce, PR 00907
TEL: (787) 493-5088
FAX: (646) 843-7603

/s/ Salvatore C. Badala
Salvatore C. Badala
400 Broadhollow Road, Suite 305
Melville, NY 11747
TEL: (212) 397-1000
sbadala@napolilaw.com

/s/ Shayna E. Sacks
Shayna E. Sacks
360 Lexington Avenue, 11th Floor
New York, NY 10017
TEL: (212) 397-1000
ssacks@napolilaw.com

*Counsel For Plaintiff*



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE

X Index No.:

MAYBROOK FIRE DISTRICT, NY, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

-against-

3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); DUPONT DE NEMOURS, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.; LION GROUP, INC.; MSA SAFETY INC. AND INNOTEX, CORP.

Defendants Plaintiff,

-against-

Defendants.

X

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**NAPOLI SHKOLNIK**
1302 Avenida Ponce de Leon
Santurce, PR 00907

The undersigned attorney hereby certifies, pursuant to 22 NYCRR 130-1.1a that he has read the within papers and that same are not frivolous as that term is defined in 22 NYCRR 130-1.1(c)

/s/ Hunter J. Shkolnik___________
Hunter J. Shkolnik

Service of a copy of the within is hereby admitted.

Dated, ________________________________

Attorney(s) for

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY

that the within is a (certified) true copy of an duly entered in the office of the clerk of the within named court on _______________200__.



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

☐ NOTICE OF SETTLEMENT

that an order of which the within is a true copy will be presented for settlement to the HON. one of the judges of the within named Court, at

on 200___ at________ O'clock ___.M.

Dated, ______________________

Yours, etc.
**NAPOLI SHKOLNIK**



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.